**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| **KEITH E. BOOTH II** | * | |
| **9738 Biggs Road** | | |
| **Baltimore County, Maryland 21220,** | * | |
| | | |
| **Plaintiff,** | * | |
| | | |
| **v.** | * | **Civil Action No. _____** |
| | | |
| **BALTIMORE CITY BOARD OF** | * | |
| **SCHOOL COMMISSIONERS,** | | |
| | * | |
| <u>**Serve On**</u>**:** | | |
| **Sonja B. Santelises, Ph. D.** | * | |
| **CEO** | | |
| **Baltimore City Public Schools** | * | |
| **200 East North Avenue** | | |
| **Baltimore City, Maryland 21202** | * | |
| | | |
| **and** | * | |
| | | |
| **SONJA BROOKINS SANTELISES, Ph. D.** | * | |
| **Individually and in her official capacity as** | | |
| **Chief Executive Officer** | * | |
| **Baltimore City Public Schools** | | |
| **200 East North Avenue** | * | |
| **Baltimore City, Maryland 21202,** | | |
| | * | |
| **and** | | |
| | * | |
| **YETUNDE REEVES, Ph. D.** | | |
| **Individually and in her official capacity as** | * | |
| **Principal, Dunbar High School (#414)** | | |
| **Paul Laurence Dunbar High School** | * | |
| **1400 Orleans St,** | | |
| **Baltimore City, MD 21231** | * | |
| | | |
| **and** | * | |
| | | |
| | * | |
| | | |
| | * | |

1

|                                                                                                                           |     |
|---------------------------------------------------------------------------------------------------------------------------|-----|
|                                                                                                                           | *   |
| **JEROME JONES**                                                                                                          | *   |
| **Individually and in his official capacity as**                                                                          |     |
| **Director of Labor Relations & Negotiations**                                                                            | *   |
| **Office of Human Capital**                                                                                               |     |
| **Baltimore City Public School System**                                                                                   | *   |
| **200 East North Avenue**                                                                                                 |     |
| **Baltimore City, Maryland 21202,**                                                                                       | *   |
|                                                                                                                           |     |
| **Defendants.**                                                                                                           | *   |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Keith Booth ("Plaintiff" or "Coach Booth"), by and through his undersigned attorneys, hereby sues the Defendants Baltimore City Board of School Commissioners (hereinafter referred to as "Board"), Sonja Brookins Santelises ("Santelises"), Yetunde Reeves ("Reeves") and Jerome Jones ("Jones"), and further states and alleges as follows:

### INTRODUCTION

1.      It takes a lifetime to earn the respect of your peers and a moment to see it evaporate.  Plaintiff, the former University of Maryland and Chicago Bulls basketball star, sadly has been forced to live this maxim as a result of the tortious and unconstitutional conduct of the Defendants.

2.      One moment, Plaintiff was the celebrated head coach of the once-glorious, boys basketball team at Paul Laurence Dunbar High School (#414) ("Dunbar") and giving back to his impoverished childhood community.  The next thing he knew, he was being fired while Dunbar's school principal, with the full knowledge and direction of the school system, was disseminating a scurrilous letter to the Dunbar community (and beyond), making false and stigmatizing

insulations of moral turpitude, and failing to give Coach Booth the slightest opportunity to defend himself or clear his name.

3.      Coach Booth had worked his entire life to establish his unblemished reputation as a scholar, high school athlete at Dunbar, a star college player at the University of Maryland, an NBA champion with the Chicago Bulls, and a caring coach and father of three.   To his players, whom Coach Booth referred to only as student athletes, Coach Booth was a mentor, and, to the community, he was an icon and a real-life hero.

4.      Coaching the boys' basketball team at Dunbar was a dream come true for Coach Booth.  Coach Booth, himself, was part of Dunbar's proud tradition of producing – from the disadvantaged neighborhood and public housing projects that surround the school – such college and NBA basketball greats as Tyrone "Muggsy" Bogues, Reggie Lewis, Sam Cassell and David Wingate. The school was further credited with molding such persons of great character and success as Chief Judge of the Maryland Court of Appeals Robert M. Bell and Beatrice Foods International Chairman and CEO Founder Reginald F. Lewis.

5.      Sadly, what began so promising, as the return of a local legend giving back to his old community, ended abruptly when a new Dunbar principal, Defendant Reeves, fired Coach Booth during his first season in the most extreme and defamatory way.  Spurred on by some powerful alumni who were concerned more about past allegiances than the development of future generations and consistent with her past history, Defendant Reeves scapegoated Coach Booth to deflect mistakes made by the administration and the school system in handling an incident of student sexual misconduct.

6.      In a defamatory and humiliating letter addressed to "Dunbar High School Parents and Guardians," and without giving Coach Booth an opportunity to defend himself, Defendant

3

Reeves announced to the Dunbar community that Coach Booth would "no longer serve as Dunbar's boys' basketball program"; that the "action [concerning the reasons to remove Coach Booth] was … currently under investigation"; that Dunbar "will always act in the best interest of the students"; that "[o]ut of respect for *Coach Booth's due process rights*, we are unable to share details of the investigation"; and that "[w]e are hopeful of concluding the matter quickly and, again, in the best interests of our student." The letter went on to "strongly encourage everyone to avoid speculation and gossip in this matter" as if there were anything to speculate and gossip about regarding Coach Booth. *There was not!*

7.      Reeve's letter was false in many respects. In noting that Coach Booth's actions implicated both his "due process rights" and "the best interests of Dunbar students" (mentioned twice), Reeve's letter implied, and readers reasonably inferred, that Coach Booth had acted in some criminal manner harmful to Dunbar students. To the contrary, it was Coach Booth who had acted in the best interests of Dunbar students, while those around him, including Defendant Reeves, stood mute.

8.      The unrevealed truth behind this letter concerned an incident of improper sexual interaction between a Dunbar junior varsity basketball student athlete and a female student manager on a team bus ride. When Coach Booth later learned of this incident, he immediately suspended the student athlete and informed Dunbar's Assistant Principal, who for days, along with Defendant Reeves, did nothing with this information.

9.      Indeed, three days after Coach Booth informed the Assistant Principal, the junior-varsity-basketball student athlete called Defendant Reeves, the Principal, directly and admitted to having touched the female. In the face of this confession, Defendant Reeves stood mute.

10.     Defendant Reeves sat silent while Coach Booth, upon the implicit direction of the Assistant Principal, wrote a statement of the incident after corroborating the incident with the female.  Once the statement reached Defendant Reeves, she fired Coach Booth, seemingly to protect herself, her school and the school system from her own inaction and ineptitude.

11.     She did not at that time inform Coach Booth that this conversation had taken place or that she knew that the underlying offense had happened.

12.     Moreover, contrary to Reeve's assertion in her letter of February 10th, there was no "matter currently under investigation" regarding Coach Booth and by Baltimore City Public Schools.  Indeed, Defendant Jones, Director of Labor Relations & Negotiations in the Office of Human Capital for Baltimore City Schools, revealed the level of Defendants' deceit when he denied Coach Booth a hearing on the basis that Coach Booth was not charged with anything and "City Schools ha[d] not investigated the allegations."

13.     Defendant Jones, in Defendants' deprivation of Coach Booth's right to a hearing to clear his name, wrote that Coach Booth had not been fired, but was only "on leave."  This was in stark contrast to Defendant Reeve's letter and related reports in the *Baltimore Sun* and other news outlets on the Internet and television that Coach Booth had been fired, which Defendants failed to correct.  This was even though Defendant Jones had ordered that Coach Booth be prohibited from setting foot in Dunbar or from speaking with any of his students or their families.

14.     In defaming and stigmatizing Coach Booth, violating his due process rights and refusing him the opportunity to clear his name, the Defendants have gravely injured a pillar in Baltimore's community.  Coach Booth will forever live with the stain of Defendants' false and defamatory letter and denial of his constitutional rights to clear his name.

15.     As Abraham Lincoln said: "not even killing the dog, will cure the bite."  This lawsuit thus seeks to compensate Coach Booth, as best possible, for the harm done to his reputation from the defamation, the deprivation of his due process rights, and the impairment thereby of his ability to further his coaching career.

## JURISDICTION AND VENUE

16.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343 and 2201.  The case arises under the Constitution of the United States and the laws of the United States and asserts a violation of civil rights secured by the United States Constitution and by federal law.

17.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391(b) because the Plaintiff's causes of action arose within the District of Maryland.  In addition, there is no other district within which this action may be brought, and the Defendants reside in the State of Maryland.

## THE PARTIES

18.     Plaintiff is a resident in the State of Maryland in Baltimore County who, at the time of the events recounted herein was an employee of the Baltimore City Public School System.

19.     Defendant Board is an authority created under the laws of the State of Maryland for the purpose of administering, managing, and operating the public schools in Baltimore City. The headquarters for Defendant Board are located at 200 East North Avenue in Baltimore. Defendant Board openly solicits employment from members of the public. In its capacity as a creation of state law to administer the public schools in a political subdivision of the State, a

municipality distinct from the State, the Defendant Board is a person acting under the color of state law for purposes of applying 42 U.S.C. § 1983.

20.     Defendant Santelises holds the position of Chief Executive Officer of Defendant Board in Baltimore City.  For purposes of the allegations of this Complaint, she has proceeded as a person acting under color of state law within the meaning of 42 U.S.C. § 1983.  For all events relevant to this Complaint, Defendant Santelises acted within the scope of her employment with Defendant Board.

21.     Defendant Reeves holds the position of Principal of Dunbar High School (#414) in Baltimore City, which is operated by and under the auspices of Defendant Board. For purposes of the allegations of this Complaint, she has proceeded as a person acting under color of state law within the meaning of 42 U.S.C. § 1983.   For all events relevant to this Complaint, Defendant Reeves acted within the scope of her employment with Defendant Board.

22.     Defendant Jones holds the position of Director of Labor Relations & Negotiations in the Office of Human Capital for Baltimore City Schools and acts in that capacity for Defendant Board in Baltimore City.  For purposes of the allegations of this Complaint, he has proceeded as a person acting under color of state law within the meaning of 42 U.S.C. § 1983. For all events relevant to this Complaint, Defendant Jones acted within the scope of his employment with Defendant Board.

**BACKGROUND FACTS**

**i.  Keith Booth – An Icon, Real Life Hero and a Product of Dunbar**

23.     It is widely accepted that "Former Maryland basketball player and Coach Booth is one of the most iconic figures in program history."[1]  His 126 consecutive basketball games started at the University of Maryland ranks third in school history.  He currently ranks 10th in all-time scoring at Maryland.  As his coach at Maryland, Gary Williams stated upon hiring coach Booth as an assistant: "Keith Booth was the most important recruit during my years here in terms of getting our basketball program to the national level … Keith always achieved success against larger opponents, and his competitive attitude will carry over to our players."[2]  A visitor to Maryland's home court at the xFinity Center will see Keith Booth's jersey hanging in the rafters among the other Maryland basketball greats.

24.     But Keith Booth is more than a former star basketball player.  He is a man who deeply cares about others and gives back to his community.  For example, when he was asked in 2018 to speak at a Black History Month event at the Henderson-Hopkins School, a new public school in the neighborhood near where he grew up, Coach Booth took it upon himself to sponsor 150 middle schoolers to attend the event that included a viewing of *Blank Panther*, a movie that allowed young African Americans envision themselves as superheroes.  As the website of the

---

[1]Josh Stirn, *Keith Booth Reflects on Choosing Maryland, Terps Career*, Inside Maryland Sports, March 1, 2019, https://247sports.com/college/maryland/Article/Maryland-Basketball-Keith-Booth-100th-Anniversary-Gary-Williams-Terps-Mark-Turgeon-129608793/ (last visited May 21, 2020) (hereinafter, "Choosing Maryland").

[2]*Keith Booth Joins Terrapins as Assistant Coach*, Maryland Official Site of Terrapin Athletics, July 15, 2004, https://web.archive.org/web/20051121070939/http://umterps.collegesports.com/sports/m-baskbl/spec-rel/071504aaa.html (last visited May 21, 2020).

Johns Hopkins School of Education, which developed and oversees the Henderson-Hopkins

School, proclaimed, Coach Booth is a "Real-Life Hero."[3]

25.     Coach Booth played high school basketball at Dunbar and in doing so became an

important part of the one of the most historic high school basketball programs in the country.

Plaintiff was one of many players, like other stars such as Muggsy Bogues, Reggie Lewis,

Reggie William, Sam Cassell and David Wingate, who played for Dunbar before going on to

college and NBA fame.

26.     Dunbar is believed to be the only public high school with three national

championships.  Its glorious history was recorded by writer Alejandro Danios in *The Boys of

Dunbar: A Story of Love, Hope and Basketball*, and captured by ESPN in the "30 for 30"

documentary:  *Baltimore Boys.*

27.     As the *Baltimore Sun*, in 1991, described Dunbar:

> Some might say basketball is just a game that means nothing. But in a school
> surrounded by a half-dozen housing projects, in a neighborhood where crime,
> drug abuse and teen-age pregnancy are everyday problems, the game is often
> everything.[4]

28.     Plaintiff's decision to attend Maryland was, itself, a testament to his internal drive

and fortitude.  After leading Dunbar to the Maryland Class "A" State Championship, being

named "Player of the Year" in Baltimore City and Maryland State, helping his team to a high

school number one ranking nationally by *USA Today*, and being selected as a Parade and

McDonald's high school All-American, Plaintiff was pressured by many at Dunbar to choose

---

[3] Laurie Ascoli, *Real-Life Hero Takes Kids to Wakanda,* John Hopkins School of
Education, May 2, 2018, https://education.jhu.edu/2018/05/real-life-hero-takes-kids-to-wakanda/
(last visited May 21, 2020).

[4] Choosing Maryland, *supra*.

9

another school, such as Duke or the University of Kentucky, which had both recruited him heavily.

29.     After leading the University of Maryland basketball team for four years, Plaintiff was a first-round draft pick of the Chicago Bulls and played alongside Michael Jordan on his final NBA championship run.  Through it all, Plaintiff worked diligently to earn a reputation as a hardworking, hard-nosed athlete of integrity.

30.     After his playing days ended, Coach Booth began a promising coaching career as an assistant coach at the University of Maryland under his former head coach, Gary Williams. Upon hiring Coach Booth, Coach Williams noted Coach Booth's stellar reputation.

31.     When Coach Williams retired as head coach from the University of Maryland and new coach Mark Turgeon brought in his own staff, Coach Booth moved back to his hometown of Baltimore to become the assistant coach of the women's basketball team at Loyola University for two years.  His good work with the women's team earned him a spot as an assistant coach of the men's basketball team.

32.     Again, Coach Booth's reputation was an important part of his appointment.  "I am excited that Keith will be bringing his basketball knowledge as a player, coach and recruiter to our staff," Head Coach G.G. Smith said at the time of his appointment.  Coach Smith stated further:  "In learning to know him as a co-worker at Loyola for the past two years, I have seen that he has a tremendous care for players, and (Loyola head women's basketball coach) Joe Logan could not have spoke[n] higher of Keith as a person or a coach. … Keith brings a broad

understanding of not only Baltimore basketball and recruiting, but his experience as a player and

coach at Maryland and player in the NBA will be huge benefits to our program."[5]

### ii.  Dunbar Head Coach Keith Booth – An Apparent Perfect Fit

33.     Coach Smith resigned from Loyola, and it was time for Coach Booth to seek his

own program to run.  That opportunity presented itself to him in May 2019 when the then-

principal of Dunbar, Tammy Mays, decided to hire Coach Booth to be the head coach of

Dunbar's boys' basketball team.

34.     As Principal Mays recognized of Coach Booth:

> When we had the conversation, I was actually moved because all
> the things he was saying are the things that as a staff we have been
> doing and preparing for the kids … We want them to have choices
> when they leave high school. We want them to be successful and
> to have someone like Coach Booth on board that has that integrity,
> that has shown that being a scholar-athlete will take you places.
> This is what we need for our students. We want them to see what
> greatness looks like.

35.     In a tearful press conference to publicly announce his hiring, Coach Booth

gratefully accepted the head coaching position of the Dunbar boys' basketball team and pledged

to honor the celebrated athletic and scholastic tradition that was Dunbar basketball.

36.     Upon his hiring, Coach Booth was provided a Handbook on Interscholastic

Athletics, which discussed issues related to player eligibility.  Significantly, however, he was

never provided with any manual that outlined Baltimore City Schools' concerning how

employees are to allegations of sexual misconduct among students.  Coach Booth was unaware

as to whether such written policies and procedures existed, at all times relevant to this

---

[5] Keith Booth, *Loyola Men's Basketball*, https://loyolagreyhounds.com/sports/mens-basketball/roster/coaches/keith-booth/6 (last visited May 21, 2020).

Complaint.  He knew, however, from his extensive coaching education, experience and training that any such incidents must immediately be reported to school administration.

### iii.  Something Amiss at Dunbar

37.     Sadly, Principal Mays would be removed as principal of Dunbar shortly after she hired Coach Booth.  She would be replaced by Defendant Reeves, who had been removed as principal of Ballou High School in Southeast Washington, D.C. ("Ballou"), after damning reports about that school's graduation practices aired on WAMU, the public radio station there.[6]

38.     Upon information and belief, Reeves was hired by Defendants without a proper interview process.

39.     Indeed, when Reeves was hired, her reputation was well known for being untruthful in a position of power as an educator and school principal and, more specifically, with respect to school operations and the welfare of students.  What happened to Keith Booth was no mistake or accident.  It was part of a larger pattern and practice of Defendant Reeves's abuse of her role as a school administrator.

40.     As the *Baltimore Sun* Editorial Board wrote shortly after her appointment:

**Public deserves to know more about new Dunbar principal**

We're not sure why the Baltimore school board thought it could quietly approve the hiring of a new Paul Laurence Dunbar High School principal who had been involved in a graduation scandal in Washington, D.C.

It was part of several routine hiring decisions made during a school board meeting this week.

---

[6] Kate McGee, *What Really Happened at Ballou, The D.C. High School Where Every Senior Got Into College*, WAMU88.5, Nov. 28, 2017, https://wamu.org/story/17/11/28/really-happened-ballou-d-c-high-school-every-senior-got-college/ (last visited May 21, 2020).

But, Yetunde Reeves is no routine hire. A simple Google search
brings up an ample number of stories about Ms. Reeves, who
appears to have been pushed out of her position at Frank W. Ballou
Senior High School in Southeast Washington after it came out two
years ago that students there were allowed to graduate despite
missing excessive numbers of days of classes.

There were bound to be questions about her background, and we
can't believe school board members didn't anticipate that. Yet,
Chairwoman Cheryl Casciani declined to discuss in detail the
reason for the hire.

* * * * *

The accusations about what happened at Ballou under Ms. Reeves'
watch shouldn't be taken lightly. Half of the graduates missed
more than three months of school during the 2016 to 2017 school
year, according to an investigation by National Public Radio and
its affiliate, WAMU. One in five students was absent more than
present — missing more than 90 days of school. Under the school
district's policy, a student who misses class 30 times should fail
the course, according to NPR.

*****

What we do know is Ms. Reeves was never formally sanctioned by
the D.C. school system and was placed on administrative leave,
according to Baltimore Chief of Schools John Davis. …

But Ms. Reeves also never returned to the Ballou, which she told a
local television station last year she once planned to do. (She
worked at a Washington charter school before getting the
Baltimore job.) It begs the question that if Ms. Reeves didn't do
anything to be sanctioned for, then why is she now trying to work
in Baltimore?

Also troubling is an audit by Washington, D.C., government
officials of what happened at Ballou, finding that there was
pressure on teachers from top administrators, including the
principal, to achieve high graduation rates.

"Ballou administrators communicated high passing percentage
expectations to teachers," the report said. "These expectations were
communicated directly to teachers from the Principal to the

Assistant Principals in person, via staff meetings, and via email,
and were formalized in the Ballou IMPACT rubric."[7]

41.    A January 2018 audit and independent report commissioned by the District of

Columbia Public Schools found that Defendant Reeves, as the Ballou leadership, violated

applicable policies and regulations; failed to appropriately train teachers; and actively

intimidated them from running to run their classrooms in an improper and inappropriate manner.

42.    More specifically, the audit found that, as school leadership, Defendant Reeves

"communicated high passing percentage expectations to teachers," notwithstanding what was

consistent with applicable policy and regulations.[8]  Teachers "described direct and indirect

pressures from school leadership to pass, promote, and graduate students regardless of content

mastery."[9]

43.    Teachers were advised by email and in-person about grading floors, in flagrant

violation of district policies.[10]  Teacher were wholly unaware of the meaning or proper

application of certain letter grades, including a specific grade for medical-leave, resulting in the

school having a greater "proportion" of that grade than "at any other school."[11]

---

[7] Editorial Board, *Public deserves to know more about new Dunbar principal*, Baltimore Sun, Jan. 26, 2019, https://www.baltimoresun.com/opinion/editorial/bs-ed-0627-new-dunbar-principal-20190626-story.html (last visited May 21, 2020).

[8] Alvarez & Marshall, Final Report: District of Columbia Public Schools Audit and Investigation, No. CW57247, at A-8 (Jan. 26, 2018).

[9] *Id.* at A-8.

[10] *Id.* at A-7.

[11] *Id.*

44.     Teachers reported feeling "intimidated or pressured to follow these more-lenient policies, and expressed concerns that they would be . . . removed . . . if they refused to follow this guidance."[12]

45.     The audit found that, as a result, Ballou had "extremely high teacher turnover" when compared with other schools in the D.C. public school system, and that it had "significant challenges retaining qualified teachers . . . ."[13]

46.     In addition to the troubling hiring of Defendant Reeves and shortly after beginning his tenure as Dunbar's head coach, Coach Booth started hearing from alumni about the importance of including certain members of the alumni association and their former coach in the running of the program.  Indeed, time after time, Coach Booth heard from Dunbar's former coach with respect to occurrences in the program just after they would happen.

47.     This was regardless of whether such intervention was appropriate or in the student athlete's best interest.

48.     Coach Booth was determined to place his student-oriented imprint on Dunbar's basketball program.  When he respectfully expressed this determination, Coach Booth received a veiled threat of "We'll see."

**iv.  Coach Booth's Student-Oriented Vision for Dunbar Basketball Success**

49.     Regardless of the hiring of a new principal and the threats from a leader in the alumni association, Coach Booth stayed true to his mission of developing the success of his student athletes.  Though he would not be paid for another six months, he began work right

---

[12]*Id.* at A-8.

[13]*Id.*

15

away, instituting programs designed to improve the play and academic development of his student athletes.

50.     After the school year began, Coach Booth worked with students athletes, attended coaches meetings and held parent and guardian meetings.  His one rule was that he would be happy to discuss anything about the players except playing time.  In that regard, players' efforts and performance would speak for themselves.  This included grades.  If grades were not up to Coach Booth's standards, he would hold a student athlete out of games, even if the student athlete was otherwise technically eligible.

51.     Coach Booth's mantra to his student athletes was "Class First – First Class."

52.     His student athletes soon became to know Coach Booth as a coach and mentor. His tasks for the team went well beyond coaching and even included laundering the team uniforms on his own time and at his own expense.

53.     Coach Booth also made it a priority to ensure that his student athletes and managers were as safe as possible.

54.     Between school and practice, he made student athletes and managers attend study hall so that they could not get into trouble.  After practice, he would not allow student athletes and managers to walk or to take the bus home.  He regularly drove five or six students, who lived in East Baltimore, home after each practice, while his assistant coach escorted another five or six home who lived in West Baltimore.  After games, Coach Booth and his staff would stay until the last child was picked up by a guardian.

55.     Notably, Coach Booth learned that, after he was terminated and these safety efforts discontinued, one student athlete was robbed after practice while another was menacingly chased.

56.     Coach Booth's coaching style was student and learning oriented.   He assigned "The Boys of Dunbar" as required reading for his student athletes and had them view ESPN's *30-for-30* episode titled "Baltimore Boys," which both told the story of a Dunbar Poets team filled with players from housing projects went unbeaten from 1981 to 1983.  He brought in Dunbar alumni, like Los Angeles Lakers Assistant Coach Sam Cassell, to speak to the team.

57.     The purposes of these assignments and lectures not only were to instill in the current Dunbar student athletes an understanding of the glorious tradition of success in which they had entered, but to show opportunity, highlight possibility, and to teach the importance of study and discipline.

58.     In this vein, Coach Booth wanted to celebrate the fact that Dunbar was one of few, if not the only, public, high school basketball programs to have won three "National Championships."  Visitors and students in Dunbar's gymnasium had to search hard to learn this feat.  With only small banners hanging in the corner of the gymnasium, Coach Booth determined to commission three new large banners to be hung prominently on the center of the north wall of the gymnasium.

59.     Coach Booth also desired better facilities for Dunbar's student athletes.  One of the first things he did upon being hired was to tour the facilities and note that, while the floor the gymnasium, which bares the name of Dunbar's former coach was new, the unseen facilities, including locker room, weight room and offices, were in a state of disrepair.  After this initial tour, Coach Booth took it upon himself to begin the effort to improve these facilities.

### v.  Coach Booth's Vision Draws Ire from Some Alumni

60.     With any change in leadership, new vision is often met by old inertia.  This was not different for the vision that Coach Booth brought to Dunbar, and he received pushback from some of Dunbar's alumni and their former coach.

61.     Though Coach Booth was able to secure the funds for the new championship banners, he met initial resistance from Dunbar's athletic director in hanging them because, as he was told, Coach Booth had not sought the permission of Dunbar's alumni association and its powerful leaders in particular to hang the banners.

62.     Coach Booth's decision to hang the banners despite the lack of permission caused even more consternation for certain supporters because it meant that there would be no room on the wall for the portrait of the former Dunbar coach to whom these powerful alumni were aligned.

63.     Ultimately, however, the athletic director and Defendant Reeves agreed with Coach Booth's vision and the banners were hung.

64.     There are other examples whereby Coach Booth, in his effort to help his players, unwittingly drew opposition from powerful individuals in Dunbar's alumni association.

65.     This included, for example and among other things, the opposition that Coach Booth met when he discovered and exposed an unsanctioned basketball tournament that had been scheduled to be held in Dunbar's gymnasium without the approval of the Dunbar administration.

66.     This also included Coach Booth's decision not to send the Dunbar boy's basketball team to the Governor's Challenge Basketball Tournament in Wicomico County, as Dunbar's former head coach had desired, choosing instead to play in the highly regarded holiday tournament at DeMatha High School in Hyattsville, Maryland.

### vi.  The Morgan Incident, Coach Booth's Action and the Aftermath

67.     On Saturday, January 11, 2020, Dunbar played in the 24th Annual Basketball Academy, sponsored by Baltimore City Public Schools.  A bus transported the varsity and junior

varsity teams, student managers, and coaches from Dunbar to and from the game site at Morgan State University.  On the bus ride back after the games, a Dunbar player allegedly touched sexually one of the female student managers.  Although Coach Booth was among those people on the bus, he was unaware for weeks that the touching had occurred.

68.     Coach Booth only learned about the incident when a separate, female student manager told him before a Saturday practice.  The victim was one of the several students whom Coach Booth knew well because she lived on the East Side of Baltimore and was one of the several whom Coach Booth often drove home after practice.  Coach Booth knew the female manager's mother because she had attended Dunbar when Coach Booth was a student there, and she often praised and thanked Coach Booth for his efforts.

69.     Immediately after that practice, Coach Booth called the accused male student athlete into his office, and he confessed.  During this same meeting, Coach Booth suspended the student athlete from the team until further notice and told the student athlete that the administration would be notified.  Coach Booth did not talk that day to the female student manager who was involved because she was not at practice.

70.     Immediately after the player left Coach Booth's office and as soon as Coach Booth was able to finish his other coaching obligations, he called Assistant Principal Lawrence Williams to report what had happened on the bus from Morgan State.  Williams instructed Coach Booth to write up a statement, but Williams stated that he was concerned that, although the player had admitted to the incident, that version of events was not corroborated.  Coach Booth understood that to mean that he should speak to the student manager who was involved for corroboration.

71.     Coach Booth did not see the manager for three more days and thus did not submit a statement until Wednesday, January 29, 2020, nor was he asked to during that time.

72.     On that day, Coach Booth saw the female manager in the afterschool study hall that was mandatory for all basketball players and managers prior to practice.  He called her out of the study hall and expressed concern at what he understood to have happened on the bus ride back from Morgan State.

73.     The student manager acknowledged the incident and stated that she had allowed it to happen.  Coach Booth informed the student manager that she would be suspended from the team until further notice and that he would notify her parents and the administration.  Satisfied that he had corroborated the incident, Coach Booth drafted a statement and delivered it to Assistant Principal Williams that day.   He then called the female manager's mother who expressed her concern but appreciation to Coach Booth, and her agreement and understanding of the decision to remove the female manager from the team.

74.     The following morning of Thursday, January 30, Defendant Reeves wrote an email to Coach Booth, stating: "This is very concerning and we will need to investigate.  I would like to meet today.  Are you available at 3:15 or 3:30!?"

75.     Coach Booth met with Defendant Reeves in her office along with Assistant Principal Williams at 3:30 p.m., as requested.  As Coach Booth entered the meeting, the female manager's mother was exiting Defendant Reeve's office.  The female manager's mother was visibly pleasant and appreciative of Coach Booth.

76.     During Coach Booth's meeting with Defendant Reeves and Mr. Williams, Defendant Reeves chastised Coach Booth for failing to bring the matter to the attention of the

"administration."  This was notwithstanding the fact that Coach Booth had done just that.  He had informed Williams immediately when Coach Booth learned of the event.

77.     Defendant Reeves instructed Coach Booth to take no further action.

78.     Assistant Principal Williams admitted in the meeting that he had failed to bring the issue to Defendant Reeves's attention and that Coach Booth, indeed, had told him the day he had learned of events.  Defendant Reeves then revealed that she had known about the event for some time.  She learned about the event on Tuesday, January 28, two days before this meeting with Coach Booth, when the player had called her on her cell phone and told her of the event using a graphic term.

79.     At Defendant Reeves's request, Coach Booth met with her and the parents of the student manager the following afternoon of Friday, January 31, when the team also had a basketball game scheduled.  Once he had explained the situation, he asked Defendant Reeves if he could leave to attend to his team before the game.  Defendant Reeves agreed.

80.     To compound events, several Dunbar alumni attended the game, and they asked to meet with Coach Booth after the game.  During this meeting, which took place in Dunbar's deteriorating facilities, these individuals complained about Coach Booth's seeming lack of respect for the alumni association and the former coach.  These individuals cited specific instances, including the failure to seek permission to hang the championship banners and to decision not to attend certain tournaments, including specifically Governor's Challenge Basketball Tournament.  Coach Booth responded that if the alumni really wanted to help Dunbar and its students, they should be raising money to fix the facilities instead of worrying and complaining about pieces canvas on the walls.

81.     Coach Booth stated that, while he retained great respect for the alumni and for their former coach, he would do what he thought to be in best interest of Dunbar's students, team and program without interference.

82.     On around February 2, Defendant Reeves sent Coach Booth a self-serving letter that followed up the January 30 and January 31 meetings and stated incredibly:  "While you mentioned an incident [on the bus from Morgan to Mr. Williams], the details were not provided to Mr. Williams."

83.     The allegation that Coach Booth failed to provide details was false.

**The Termination, Defamation and Deprivation of Coach Booth's Rights**

84.     On Thursday, February 6, Coach Booth received a message through Defendant Reeves that Daryl Kennedy, the Instructional Leadership Executive Director for Baltimore City Public Schools, wanted to see Coach Booth in Mr. Kennedy's office at North Avenue.  He wanted the meeting to take place at 3:30 p.m. on Monday, February 10, a time scheduled for team practice.  The meeting took place that afternoon notwithstanding Coach Booth's best efforts to attend practice and to be there for his players both in the interim and at the time of appointed meeting.

85.     During the meeting, which Defendants Reeves also attended, Mr. Kennedy handed Coach Booth a letter signed by Defendant Jones and dated February 7, 2020, informing him that "Serious allegations have been made in connection with [his] duties as the boys' basketball coach at Dunbar …"; that he would "no longer be permitted to report to Baltimore City Public Schools for work, interact with the team or attend Dunbar's boys' basketball games until advised in writing otherwise"; and that he was "directed not to have any contact, whether in

person or by phone, email, or by other means of communications, with any students (or their families) or staff of Baltimore City Schools Athletics Office."

86.     At this point in time, Coach Booth was well within the term of his written, employment contract with the Board.

87.     Coach Booth further learned during this meeting that a Dunbar alum purportedly had sent an email to Defendant Santelises, expressing concerns about Coach Booth and that this email and Defendant Santelises' response were factors in Defendants' action against him.

88.     The meeting was held at the North Avenue office at the request of Defendant Reeves.  Defendant Reeves, seizing upon the fact that Coach Booth would not be at Dunbar at the time of the meeting while practice was being held, directed Dunbar's Athletic Director to distribute to the team a letter from Defendant Reeves addressed to the entire Dunbar community. The letter was approved by various individuals in the school system and delivered with the approval of the school system electronically through the school's technology group to a distribution list.  This letter – with its *per se* defamatory content, especially given Coach Booth's role as an educator and basketball coach who close works with student athletes – is at the core of the defamation claim here.

89.     The letter, a copy of which is attached and incorporated hereto as Exhibit A, stated in relevant part:

> Coach Keith Booth **will no longer serve** as Dunbar's boys' basketball program [sic], effective Feb. 10, 2020. ***The action was taken*** as a result of a personnel matter ***currently under investigation by the Baltimore City Public Schools***.
>
> Please know we will always act in ***the best interests of our students and community***.  Out of respect for ***Coach Booth's due process rights*** as an employee, we are unable to share ***details of the investigation***.  We are hopeful of concluding the matter quickly and, again, ***in the best interest of our students***.

In the meantime, *we strongly encourage everyone to avoid speculation and gossip in the matter*. … [Emphasis added.]

90.     Based on this content and the unique context, a reasonable reader would infer that Coach Booth was fired (as opposed to suspended or put on leave) from his position as basketball coach because he was a threat to the best interests of the students.

91.     The letter emphasized the threat Coach Booth posed to the best interests of students by stating it twice in just three, short paragraphs.  The issue was sufficiently severe to be, according to Defendant Reeves, the subject of an ongoing investigation, to merit concerns about his due process (plainly understood), and to be something for speculation and gossip.  In short, a reasonable reader would infer that Defendant Booth had committed a heinous act involving children.

92.     The letter was false.  Coach Booth did not pose a threat to the best interests of students, he was not the subject of an investigation, especially to merit concern about his due process rights, there was no reason for speculation and gossip about Coach Booth, and he had committed no heinous acts.

93.     Moments after leaving the meeting with Kennedy and Defendant Reeves, Coach Booth received calls from friends and parents of his players, asking if he knew that he had been accused of harming students or that he had been fired.  Dunbar parent Shawntay Stevenson stated, as reported by WBAL, "When I first read the letter, I'm reading it and I'm, like, well, did he do something to somebody's child or something?"[14]

_____

[14] Pete Gilbert, *Baltimore Basketball Legend Keith Booth Fired as Alma Mater's Coach*, WBAL-TV, https://www.wbaltv.com/article/baltimore-basketball-legend-keith-booth-fired-from-alma-mater-paul-laurence-dunbar-high-school-as-basketball-coach/30861229# (last visited May 21, 2020).

94.     Within hours, the Baltimore Sun had posted articles with headlines such as: "Former Dunbar and Maryland star Keith Booth fired as Poets boys basketball coach during first season."  Soon thereafter, WBAL posted a story entitled, "Baltimore basketball legend Keith Booth fired as alma mater's coach," and WJZ TV posted "Former Terrapins Star Keith Booth Fired As Dunbar High School's Head Basketball Coach."  At least one letter dated February 11, 2020, quoted the defamatory contents of the letter.

**Defendants' Denial of Coach Booth's Request for Hearing**

95.     Based on the content of the letter, Coach Booth, through counsel, sent Defendant Jones a letter on February 13, 2020, requesting a statement of charges and an opportunity to present witnesses at a hearing.  Jones is the Director of Labor Relations & Negotiations in the Office of Human Capital for Baltimore City Schools, citing Section 6-202 of the Education Article of the Maryland Code.

96.     Maryland Code, Education § 6-202 provides that an individual such as Coach Booth who is dismissed or suspended is entitled to receive a copy of the charges against him before removal.  The statute further states, "The individual shall have an opportunity to be heard before the county board, in person or by counsel, and to bring witnesses to the hearing" so long as the hearing was requested within 10 days.

97.     In a letter dated February 18, 2020, a copy of which is attached and incorporated hereto as Exhibit B, Defendant Jones replied and stated:

> The letter from my office to Mr. Booth placed him on leave from the position of head basketball coach, *he has not been terminated*. Since, Mr. Booth has not been terminated, Section 6-202, subsection (2) of the Education Article of the Annotated Code of Maryland is not applicable. *City Schools has not investigated the allegations*; therefore *Mr. Booth has not been charged*. It is the practice of City Schools that if an employee is interviewed because of an allegation the employee has the right to have a representative present during

the interview. This process will afford you an opportunity to represent the interest of Mr. Booth in the interview prior to the issuances of any charges.

98. Defendant Jones's statements are in direct contravention to prior statements (whether implicitly or explicitly) that Coach Booth had been terminated, such action was in the best interests of the children, and that the matter was under investigation. The claim that Coach Booth has not been terminated, investigated or charged is a contrivance designed to improperly deprive Coach Booth of his rights to protect himself and clear his name.

99. While Defendant Jones stated that Section 6-202 did not apply, Defendant Jones provided no clarification as to what statutory or regulatory scheme did apply. As such, and ever since then, Coach Booth has been languishing in a purgatory for Defendants' bad acts related to something that he did not do.

100. As of the date of this filing, Coach Booth has heard absolutely nothing further from Defendants. He has been given no opportunity to be heard or to clear his name. Coach Booth is unemployed and defamed. But still he has not received a copy of the charges against him (if any), and, notwithstanding a timely request through undersigned counsel, he was denied a hearing. Federal constitutional protections afford similar guarantees that an individual deserves a name-clearing hearing in circumstances such as these.

**Count 1**
**42 U.S.C. § 1983:  Deprivation of Due Process / Liberty Interest**
**(Defendants Board, Santelises, Jones and Reeves)**

101. Plaintiff hereby adopts and incorporates by reference the allegations contained in the preceding paragraphs of the Complaint as if set forth fully herein.

102.    Plaintiff had a constitutionally protected liberty interest in his reputation, to be free from a wrongfully, government-imposed stigma as further described herein, cognizable under the Fourteenth Amendment of the United States Constitution.

103.    Defendants Board, Santelises, Jones, and Reeves deprived Plaintiff of a liberty interest by making statements against him that: placed a stigma on his reputation; were made public by the Defendants; were made in conjunction with his termination or demotion; and were false.

104.    Defendants Board, Santelises, Jones, and Reeves, whether individually or collectively, acted under color of law in that each used power possessed by virtue of the law and was clothed otherwise by the authority of law, including without limitation any statute, ordinance, regulation, custom, or usage.

105.    The conduct of Defendants Board, Santelises, Jones, and Reeves, whether individually or collectively, was not reasonable when *inter alia* they, whether acting individually or collectively, imposed a stigma on Plaintiff's reputation and damaged his credibility, trustworthiness, name and reputation in doing so.

106.    Furthermore, Defendants Board, Santelises, Jones, and Reeves used the power of the state to impose that stigma on Plaintiff's reputation.

107.    They acted to Plaintiff's detriment and deprived him of his federally recognized liberty interest without affording any opportunity to contest any findings, to clear his name, or other relief that would have been associated with due process.

108.    To this day and notwithstanding the efforts of the undersigned counsel, Defendants Board, Santelises, Jones, and Reeves have denied Plaintiff a hearing with the opportunity *inter alia* to clear his name.

109.    The uttered statement at issue, as detailed at length, is capable of being proved false and is false.  The statement, made in connection with Plaintiff's loss of employment, is riddled with fundamental inaccuracies that have been cast far and wide.

110.    To this day, the basis for the actions of Defendants Board, Santelises, Jones, and Reeves is wholly unclear notwithstanding the efforts of the undersigned counsel to gather more information -- albeit, admittedly it too little too late given considerations of the stigma imposed.

111.    The stigmatizing statement goes beyond mere defamation.

112.    The stigmatizing statement amounts to a material government-imposed burden and government-imposed alteration of Plaintiff's status and rights in addition to the stigmatizing statement.

113.    The state's wrongful action includes the termination of plaintiff's employment, which constitutes conduct that goes far beyond the mere utterance of the stigmatizing statement.

114.    The state's wrongful action includes the imposition on Plaintiff of an unwarranted suggestion that he is unfit to perform his duties as a coach or a similar position.

115.    The state's wrongful action includes a tarnish on the reputation of Plaintiff and all of his professional accomplishments to include his basketball career as a whole.

116.    The state's wrongful action includes a tarnish on the reputation of Plaintiff as a caring member of the community and a solid family man and father of three children.

117.    With regards to Defendant Santelises specifically, Defendant Santelises directed Defendants Jones and Reeves to take action, as further described herein, while knowing that these actions would result in a violation of law or should have reasonably known the same; and had actual knowledge of the violation of law caused by each Defendants Jones and Reeves and acquiesced to that violation.

118.    Defendants Board, Santelises, Jones and Reeves each acted with a common understanding and agreement to deprive Coach Booth of his rights in violation of law.

119.    Defendants Board, Santelises, Jones, and Reeves acted deliberately, intentionally, willfully, recklessly, with ill-will or spite, in a grossly negligent fashion or otherwise with wanton or reckless disregard for the rights of others, and with actual and constitutional malice.

120.    As a direct and proximate result of the conduct described herein, Defendants Board, Santelises, Jones, and Reeves caused Plaintiff damages suffered and that will continue to be suffered to include *inter alia* physical damages; emotional and mental harm; and past and future wages, lost earnings, salary, and the reasonable value of working time.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment against Defendants Board, Santelises, Reeves and Jones; and award any and all damages to include compensatory damages, punitive damages, costs and interest in an amount that will be established at trial; and afford any other relief that this Court deems just and proper.

### Count 2
### 42 U.S.C. § 1983:  Deprivation of Due Process / Property Interest
### (Defendants Board, Santelises, Jones and Reeves)

121.    Plaintiff hereby adopts and incorporates by reference the allegations contained in the preceding paragraphs of the Complaint as if set forth fully herein.

122.    Plaintiff had a constitutionally protected property interest in his continued employment, cognizable under the Fourteenth Amendment of the United States Constitution.

123.    Defendants Board, Santelises, Jones, and Reeves, whether individually or collectively, acted under color of law in that each individual used power possessed by virtue of the law and was otherwise clothed by the authority of law, including without limitation any statute, ordinance, regulation, custom, or usage.

124.     While acting under color of law, Defendants Board, Santelises, Jones, and Reeves, whether acting individually or collectively, deprived Plaintiff of his federally recognized property interest without affording him due process.

125.     <u>With regards to Defendant Santelises specifically</u>, Defendant Santelises directed Defendants Jones and Reeves to take action, as further described herein, while knowing that these actions would result in a violation of law or should have reasonably known the same. Defendant Santelises further and had actual knowledge of the violation of law caused by each Defendants Jones and Reeves and acquiesced to that violation.

126.     Defendants Board, Santelises, Jones and Reeves each acted with a common understanding and agreement to deprive Coach Booth of his rights in violation of law.

127.     In unconstitutionally depriving Coach Booth of his property rights, Defendants Santelises, Jones and Reeves each knew of the wrongful act and substantially assisted each other in committing the wrongful act.

128.     Without affording proper process, Defendants Board, Santelises, Jones, and Reeves deprived Plaintiff of his continued employment and, as importantly, placed a stigma on his reputation and damaged his credibility, trustworthiness, name and reputation in doing so.

129.     To this day, Defendants Board, Santelises, Jones, and Reeves have deprived Keith Booth of the opportunity to have a hearing.  This is even after his termination, which amounts to an alarming abuse of power.

130.     In other words, Defendants Board, Santelises, Jones, and Reeves used the power of the state to deprive Plaintiff of his employment without allowing him due process.  They acted to Plaintiff's detriment without affording any opportunity to learn of the accusations against him, to contest any findings, or to clear his name.

131.    To this day, the basis of Plaintiff's termination is wholly unclear notwithstanding the diligent efforts of counsel to gather more information.

132.    Defendants Board, Santelises, Jones, and Reeves acted deliberately, intentionally, willfully, recklessly, and in a grossly negligent fashion or otherwise with wanton or reckless disregard for the rights of others, and with actual and constitutional malice.

133.    As a direct and proximate result of the conduct described herein, Defendants Board, Santelises, Jones, and Reeves caused Plaintiff damages suffered and that will continue to be suffered to include *inter alia* physical damages; emotional and mental harm; and past and future wages, lost earnings, and the reasonable value of working time.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment against Defendants Santelises, Reeves and Jones; and award any and all damages to include compensatory damages, punitive damages, costs and interest in an amount that will be established at trial; and afford any other relief that this Court deems just and proper.

### Count 3
### Defamation *Per Se* and *Per Quod*
### (Defendants Board, Santelises and Reeves)

134.    Plaintiff hereby adopts and incorporates by reference the allegations contained in in the preceding paragraphs of the Complaint as if set forth fully herein.

135.    Defendants Board, Santelises and Reeves made a written statement to a third party, to include "Dunbar High School Parents and Guardians" and those individuals included on the school's electronic distribution list.

136.    The statement was about Plaintiff and specifically identified him by name, as described in Paragraphs 6 and 89 hereto.

137.    The statement was false, as further described in Paragraphs 7-12 and 90-92 hereto, in that it was substantially untrue by being directly untrue and implying a fact that was untrue.

138.    The falsity of the statement was material.

139.    Defendants Board, Santelises and Reeves published a statement with the requisite degree of fault, as contemplated by Maryland law, in making such a statement in that the Defendants were negligent, were grossly negligent, knowingly and recklessly disregarded the rights of others, and acted intentionally or acted knowingly.

140.    The statement was defamatory *per se* in that the defamatory quality of the statement is apparent from the words themselves.

141.    The statement was defamatory *per quod* in that it tended to expose Plaintiff to public scorn, hatred, contempt or ridicule, effectively discourages others in the community from having a good opinion of or associating with Plaintiff.

142.    The statement was not made with an honest belief that the statement was true at the time it was made.

143.    The statement was not an opinion.

144.    Plaintiff did not consent to the publication of the statement, which went far and wide.

145.    The statement was not protected by a privilege as contemplated by Maryland law and was otherwise made in excess of any such applicable privileges.

146.    As a direct and proximate cause of Defendants' statement, Coach Booth has suffered injury and will continue to suffer injury to include economic damages and noneconomic damages.

147.    Defendants Board, Santelises, Jones, and Reeves acted with actual and constitutional malice in that they acted deliberately, intentionally, willfully, recklessly, with ill-will or spite, and in a grossly negligent fashion.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment against Defendants Board, Santelises, and Reeves, and award all damages including presumed damages, compensatory damages, punitive damages, costs and interest in an amount that will be established at trial, and any other relief that this Court deems just and proper.

### Count 4
### Negligent Hiring and Supervision
### Defendants Board and Santelises

148.    Plaintiff hereby adopts and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if set forth fully herein.

149.    Defendant Reeves was hired by, an employee of, and under the supervision of Defendants Board and Santelises.

150.    In selecting and retaining Defendant Reeves, Defendants Board and Santelises had the duty of an employer to use reasonable care to select an employee who was competent and fit for the work assigned.

151.    Further, Defendants Board and Santelises had a duty to refrain from retaining the services of an incompetent and unfit employee.

152.    As the facts alleged herein demonstrate, Defendant Reeves was incompetent, unfit, and untrustworthy.  This incompetence, lack of fitness, and untrustworthiness posed an unreasonable threat to Plaintiff (among others), as did her propensity to act inappropriately in order to camouflage hide these same traits.

33

153.    As detailed herein, Defendants Board and Santelises had actual and constructive knowledge of Defendant Reeves's incompetence, unfitness, and untrustworthiness based on *inter alia* Defendant Reeves's conduct while at Ballou, part of the D.C. public school system.  Further, they had actual and constructive knowledge of her propensity to act inappropriately in order to camouflage her shortcomings.

154.    Such incompetence, unfitness, and untrustworthiness, per the findings of a publicly available audit, included:  flagrantly violating applicable policies and regulations; failing to appropriately train educators and to make them aware of applicable policies; and directly and indirectly intimidating educators to perform their duties in an improper and inappropriate manner.

155.    Such incompetence, unfitness, and untrustworthiness also included, per the findings of a publicly available audit, acting in a manner such that it was clear that educators would be removed for failing to follow Defendant Reeves's guidance, regardless of how improper or inappropriate.

156.    Notwithstanding this knowledge of Defendant Reeves's demonstrated incompetence, unfitness, and untrustworthiness while at Ballou, Defendants Board and Santelises hired and retained Defendant Reeves to lead Dunbar.

157.    Defendant Reeves's acts and omissions with regards to Plaintiff Keith Booth are related to her incompetence, unfitness, and untrustworthiness.  They also related to her propensity to act inappropriately in order to cover these traits.

158.    This includes, while at Dunbar and as applied to Plaintiff, flagrantly violating applicable policies and regulations; failing to appropriately train educators and to make them

aware of applicable policies; and directly and indirectly intimidating educators to perform their duties in an improper and inappropriate manner.

159.    This also includes acting in a manner such that it was clear, while at Dunbar and as related to Plaintiff, that educators would be removed for failing to follow Defendant Reeves's guidance, regardless of how improper or inappropriate.

160.    Defendants Board and Santelises' negligence, gross negligence and actual malice in hiring and retaining Defendant Reeves was the proximate cause of Plaintiff's injuries.

161.    But for Defendant Reeves serving as Dunbar's principal, Plaintiff never would have been wrongfully accused, terminated without any investigation of statement of charges, defamed by a scurrilous letter and denied due process.

162.    Plaintiff has suffered severe economic and non-economic harm in the form of lost income, loss status in the community, emotional distress, pain and suffering and mental anguish.

**WHEREFORE,** Plaintiff Keith Booth respectfully requests that this Court enter judgment against Defendants Board and Santelises, and award all damages including compensatory damages, costs and interest in an amount that will be established at trial, and any other relief that this Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a jury trial as to all claims so triable.


Dated:          May 22, 2020,

                              Respectfully submitted,


                              _____/s/ Barry L. Gogel_____
                              Barry L. Gogel (Md. Fed. Bar No. 25495)

Marilee L. Miller (Md. Fed. Bar No. 17458)
RIFKIN, WEINER, LIVINGSTON LLC
2002 Clipper Park Road, Suite 108
Baltimore, MD 21211
(410) 769-8080 (Office)
(410)-769-8811 (Fax)
bgogel@rwllaw.com
mlmiller@rwllaw.com