**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| **KEITH E. BOOTH II,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | |
| **BALTIMORE CITY BOARD OF** | * | **Civil Action No.  20-cv-01281-LBM** |
| **SCHOOL COMMISSIONERS,** *et al.,* | * | |
| **Defendants.** | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS OR, IN THE ALTERNATIVE,**
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

Barry L. Gogel (Md. Fed. Bar No. 25495)
Marilee L. Miller (Md. Fed. Bar No. 17458)
RIFKIN, WEINER, LIVINGSTON LLC
2002 Clipper Park Road, Suite 108
Baltimore, MD 21211
(410) 769-8080 (Office)
(410)-769-8811 (Fax)
bgogel@rwllaw.com
mlmiller@rwllaw.com

# Table of Contents

Table of Contents ........................................................................................................ i

Table of Authorities ..................................................................................................... ii

Introduction ............................................................................................................... 1

Standards of Review ................................................................................................. 3

    1.  Rule 12(b)(6) Motion to Dismiss ............................................................... 3

    2.  Disfavored, Rule 56 Motion for Summary Judgment Pre-Discovery ........... 3

Statement of Known, Material Facts in Dispute ....................................................... 4

    A.  Keith Booth Brings His Stellar Reputation, Skills
          and Care to His *Alma Mater* ................................................................ 4

    B.  The Morgan Bus Incident ....................................................................... 5

    C.  The Firing and the Defamation ............................................................... 7

    D.  The Deprivation of Coach Booth's Due Process Rights ............................ 9

    E.  Defendants' Previously Unstated and False Justifications for
          Firing Coach Booth ............................................................................... 11

Argument .................................................................................................................. 13

    A.  The Board Can Be Held Liable in a 42 USC § 1983 Case ........................ 13

    B.  The Complaint Alleges Facts to Establish a Deprivation of
          Coach Booth's Liberty Interests Without Due Process ............................. 15

          (1)    The Reeves Letter Placed a Stigma on Coach
                     Booth's Reputation ................................................................. 16

          (2)    The Reeves Letter was Made Public by the
                     Employer ................................................................................ 18

          (3)    The Reeves Letter was Made in Conjunction with
                     Coach Booth's Termination and/or Demotion ......................... 19

          (4)    The Reeves Letter was False in Fact and by
                     Insinuation ............................................................................. 21

C. The Complaint Alleges Facts to Establish a Deprivation of
Coach Booth's Property Interest Without Due Process ...............................................22

D. The Individual Defendants are Not Entitled to Qualified
Immunity for Violations of Clearly Established
Constitutional Rights .................................................................................................25

E. Coach Booth Stated Causes of Action for Both Defamation
*Per Se* And *Per Quod* When School Executives Blessed
A False, Scurrilous Letter, Written by Defendant Reeves,
For Circulation to The School and Beyond ................................................................26

   a. Defamation *Per Se* ..........................................................................................27

   b. Defamation *Per Quod* ......................................................................................29

F. The Complaint States a Plausible Claim for Negligent Hiring and Supervision .........32

Conclusion ....................................................................................................................35

**Table of Authorities**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................4, 32

*A. S. Abell Co. v. Barnes*, 258 Md. 56 (1970) ...............................................................................30

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................................3

*Batson v. Shiflett*, 325 Md. 684 (1992) ...........................................................................................31

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................................3

*Bd. of Regents v. Roth*, 408 U.S. 564 (1972) .....................................................................15, 20, 25

*Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720 (D. Md. 1996)...................32

*Cannon v. Vill. of Bald Head Island*, 891 F.3d 489 (4th Cir. 2018) ....................................15, 16, 21

*Chesapeake Publ'g Corp. v. Williams*, 339 Md. 285 (1995) ..........................................................27

*Cotton v. Jackson*, 216 F.3d 1328 (11th Cir. 2000) .......................................................................19

*Cox v. N. Va. Transp. Comm'n*, 551 F.2d 555 (4th Cir. 1976) ................................................17, 21

*Curtis Pub. Co. v. Butts*, 388 U.S. 130 (1967) ..............................................................................30

*Donato v. Plainview–Old Bethpage Cent. School Dist.*, 96 F.3d 623 (2d Cir. 1996)...................18

*Embrey v. Holly*, 48 Md. App. 571 (1981), *aff'd in part, rev'd in part*, 293 Md. 128 (1982) ......27

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ...................................................................30, 32

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ........................................................................................20

*Gregg v. Ham*, 678 F.3d 333 (4th Cir. 2012) ................................................................................25

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ...................................................................................25

*Hamilton v. Mayor & City Council of Baltimore*, 807 F.Supp.2d 331 (D. Md. 2011).................25

*Hearst Corp. v. Hughes*, 297 Md. 112 (1983) ...............................................................................29

*Henry v. Purnell*, 652 F.3d 524 (4th Cir. 2011)............................................................................25

*Hosmane v. Seley-Radtke*, 227 Md. App. 11, *aff'd*, 450 Md. 468 (2016) ......................................30

*Hudson v. Palmer*, 468 U.S. 517 (1984).......................................................................................24

*Jacron Sales Co., Inc. v. Sindorf*, 276 Md. 580 (1976) ................................................................30

*Johnson v. Morris*, 903 F.2d 996 (4th Cir. 1990) ........................................................................15

*Kairys v. Douglas Stereo, Inc.*, 83 Md. App. 667 (1990) ............................................................29

*Kilgour v. Evening Star Newspaper Co.*, 96 Md. 16 (1902)..........................................................28

*Kumaran v. Brotman*, 617 N.E.2d 191 (Ill. Ct. App. 1993) .........................................................28

*Laughlin v. Metro. Wash. Airpts. Auth.*, 149 F.3d 253 (4th Cir. 1998) ..........................................3

*McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480 (4th Cir. 2014)................3, 4

*McGhee v. Draper*, 564 F.2d 902 (10th Cir. 1977) ................................................................20, 26

*McNeill v. Butz*, 480 F.2d 314 (4th Cir. 1973) .........................................................................17, 21

*Metromedia, Inc. v. Hillman*, 285 Md. 161 (1979).................................................................27, 29

*Miller v. Baltimore City Bd. of School Com'rs*, 833 F. Supp. 2d 513 (2011) ........ 20, 23-24, 25, 26

*Mitchell v. Glover*, 996 F.2d 164 (7th Cir. 1993) ........................................................................19

*Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978) ..........................................................14, 15

*Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130 (4th Cir. 1993)...........................................................3

*Owen v. City of Independence, Mo.*, 445 U.S. 622 (1980) ...........................................................14

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)..............................................................14, 15

*Perry v. Asphalt & Concrete Servs., Inc.*, 447 Md. 31 (2016).....................................................32

*Richmond Newspapers, Inc. v. Lipscomb*, 362 S.E.2d 32 (Va. 1987) ..........................................31

*Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518 (4th Cir. 2000).....................................14

*Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292 (4th Cir. 2006)).............. 16, 20, 25-26

*Royster v. Bd. of Trs.*, 774 F.2d 618 (4th Cir.1985)..................................................22, 23

*Sciolino v. City of Newport News*, 480 F.3d 642 (4th Cir. 2007) ....................................15, 16, 20

*Shapiro v. Massengill*, 105 Md. App. 743 (1995) ................................................... 27-28

*Socol v. Albemarle Co. Sch. Bd.*, 399 F.Supp.3d 523 (W.D. Va. 2019)................................. 16-18

*Stone v. Univ. of Md. Med. Sys. Corp.,* 855 F.2d 167 (4th Cir.1988)gr .......................................20

*Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144 (10th Cir. 2001) ................ 18-19

*St. Luke Evang. Lutheran Ch., Inc. v. Smith*, 74 Md. App. 353 (1988), *rev'd in part on other grounds*, 318 Md. 337 (1990) .......................................................................31

*Velez v. Levy*, 401 F.3d 75 (2d Cir. 2005)...........................................................18, 26

*Warford v. Lexington Herald Leader*, 789 S.W.2d 758 (Ky. 1990)........................................30

*Wilcox v. Newark Valley Cent. School Dist.*, 904 N.Y.S.2d 523 (3d Dep't 2010) ............18, 26, 28

*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) ..................................................15

*Willner v. Comm. on Character*, 373 U.S. 96 (1963) ......................................................20

*Wilson v. Prince George's Cty.*, 893 F.3d 213 (4th Cir. 2018)....................................25

*Wisconsin v. Constantineau*, 400 U.S. 433 (1971) ......................................................21

*Zinermon v. Burch*, 494 U.S. 113 (1990)..............................................................24

U.S. Const. amend. XIV ...............................................................................15

42 U.S.C. § 1983 ............................................................................... 13-14, 15

Md. Code Ann., Educ. § 4-302 ......................................................................13

Md. Code Ann., Educ., § 6-202..................................................................10, 26

Plaintiff Keith Booth ("Plaintiff" or "Coach Booth"), by and through his undersigned attorneys, hereby submits this Memorandum in Opposition to the Motion to Dismiss or in the Alternative for Summary Judgment, EFC Dkt. No. 9, filed by Defendants Baltimore City Board of School Commissioners (hereinafter referred to as "Board"), Sonja Brookins Santelises ("Santelises"), Yetunde Reeves ("Reeves") and Jerome Jones ("Jones").[1]

## Introduction

On February 10, 2020, Plaintiff, then head coach of the boys' basketball team at his *alma mater*, Paul Laurence Dunbar High School ("Dunbar"), was summoned to headquarters of Baltimore City Public Schools and told that he was being summarily dismissed before the end of the season and the school year. As he was being fired at headquarters, Defendants were distributing a scurrilous letter to Coach Booth's team and to the entire Dunbar school community and beyond by "robocall" email. That letter falsely stated that Coach Booth was being removed due to a "personnel matter currently under investigation by the Baltimore City Public Schools," which "the best interests of our students" (stated twice) made necessary, and which more could not be stated due to "Coach Booth's due process rights." The letter went on to "strongly encourage everyone to avoid speculation and gossip" as if there were reason to speculate and gossip about Coach Booth.

There was not: there was no pending investigation concerning Coach Booth nor had he harmed any students or threatened their best interest. He had not done anything criminal in nature, which is what common parlance associates with "due process" rights. All Coach Booth did was learn about an alleged consensual incident on a bus between two students and then report it and corroborate it, as he reasonably believed he had been instructed to do. But, because Coach Booth had gotten on the wrong side of some powerful alumni who controlled Dunbar affairs, he has been

---

[1] Along with this Opposition, Plaintiff has filed a Motion Pursuant to Fed R. Civ. P. 56 (d) for Leave to Conduct Discovery, which Plaintiff incorporates herein.

forced to suffer a unmerited, public termination in the most stigmatizing manner imaginable and with significant damage to his prospects of continuing in a line of work that he loves.

Anyone who knows Plaintiff Keith Booth readily understands that the letter announcing his dismissal was _grossly_ _false_, as is the _very_ _opening_ of the Defendants' Memorandum ("Defs. Memo."). Keith Booth does _not_ believe "he is entitled to special treatment … ." **Defs. Memo., 3**. To the contrary, he merely expects the same treatment as anyone who has been wronged as he has been in this case. As a sport reporter publicly wrote just after Coach Booth's firing from Dunbar:

> The people that have known Keith for a long time, know his character, vigorously support him. What is abundantly clear though, there are kids that no longer have a strong leader and mentor. One who returned to his alma mater to work with kids that were just like him growing up. And that is a terrible shame. (**Ex. 1**).

Defendants' forty-one-page memorandum is littered with misstatements, disputes of facts and errors of law, which demonstrate that this case is entirely inappropriate for dismissal or summary judgment. The Defendants ask this Court to litigate the merits of Defendants' firing of Coach Booth – rather than the causes of actions presented – based on their false, one-sided presentation of facts, without any discovery and relying on affidavits of two Defendants.

Plaintiff has plead fact to establish plausible claims pursuant to each cause of action alleged. Defendants violated Coach Booth's liberty interests without due process (Count 1) by widely publishing a stigmatizing and false statement in conjunction with his removal as Dunbar's head coach, and providing him no opportunity to clear his name, as the law requires. Similarly, without notices of charges or opportunity to be heard, Defendants violated Coach Booth's property interests without due process (Count 2) by removing him employment before the end of its term. When taken as a whole, the facial and reasonably inferred lies in Defendants' letter, _i.e._, falsely alleging that Coach Booth was under investigation and had harmed students, are defamatory per se and per quod (Count 3). And, the Board and Santelises were negligent in hiring Reeves (Count

4), the principal who signed the letter and caused so much of the damage, because her propensity to disregard rules, engage in falsehoods and threaten the employment of teachers without basis was so known and foreseeable that *the Baltimore Sun* had warned against her hiring at the time she was hired.

## Standards of Review

1.  Rule 12(b)(6) Motion to Dismiss.

In considering a motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must construe the complaint in the light most favorable to the plaintiff, reading the complaint as a whole and taking the facts asserted therein as true. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). A claim for relief must be "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and the well-pleaded facts permit the Court to infer the "possibility of misconduct." *Iqbal*, 556 U.S. at 678, 69.

2.  Disfavored, Rule 56 Motion for Summary Judgment Pre-Discovery.

"When matters outside the pleading are presented to and not excluded by the court, the [12(b)(6)] motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." *Laughlin v. Metro. Wash. Airpts. Auth.*, 149 F.3d 253, 260-61 (4th Cir.1998). Summary judgment "should only be granted after adequate time for discovery" and should be denied in circumstances, like those here, "when the nonmoving party 'has not had the opportunity to discover information that is essential to his opposition.'" *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014) (internal quotation marks omitted). Summary judgment is appropriate only if, after facts in light most favorable to the non-moving party, the

moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Summary judgment before discovery forces the non-moving party into a fencing match without a sword or mask." *McCray*, 741 F.3d at 483.

### Statement of Known, Material Facts in Dispute

A.  Keith Booth Brings His Stellar Reputation, Skills and Care to His *Alma Mater.*

After an illustrious career playing basketball at the University of Maryland and in the NBA, Keith Booth set forth on a coaching career that lead him back where he began – his high school *alma mater*, Dunbar. **Complaint ("Cpl.") ¶¶1-5**. Throughout his career, Coach Booth established an unblemished reputation as a scholar athlete and caring coach who gives back to the disadvantaged Dunbar community in which he was raised. *Id.***, ¶¶3, 23-33; Ex. 1**. As the Johns Hopkins School of Education declared: Coach Booth is a "Real-Life Hero." **Cpl. ¶24, Exs. 2, 3**.

In May of 2019, Dunbar's then-principal, Tammy Mays, who was later replaced by Reeves, decided to hire Coach Booth to be the head coach of the boys' basketball team because of his integrity and dedication to preparing student athletes for life. *Id.***, ¶¶33-34**. As head coach of Dunbar, Coach Booth followed one guiding mantra "Class First – First Class." *Id.***, ¶51**. Coach Booth began work right away, before the basketball season had started, instituting programs designed to improve the academic and physical development of his student athletes, and his team soon came to know him as a coach and mentor. *Id.***, ¶¶49, 52**. His one rule was that he would discuss anything about the players, except playing time. *Id.* In that regard, players' efforts, performance and grades would speak for themselves. *Id.* If a student athlete's grades were not up to Coach Booth's standards, he would hold the player out of games. *Id.* He also assigned *The Boys of Dunbar* as required reading and had the team view ESPN's "30-for-30" episode titled *Baltimore*

*Boys*, which both told the story of Dunbar's 1981-83 teams, which went unbeaten and were filled with players from housing projects. *Id.*, ¶¶**26, 56**. He brought in Dunbar alumni, like L.A. Lakers Assistant Coach Sam Cassell, to speak to the team during the team study hall. *Id*.

Coach Booth also made it a priority to ensure that his student athletes and team managers were as safe as possible and focused on their intellectual development. *Id.* **at 53**. Between school and practice, he made student athletes and managers attend study hall so that they could study and not get into trouble. *Id.*, ¶**54**. After practice, Coach Booth regularly drove five or six students, who lived in East Baltimore, while his assistant coach escorted another five or six home who lived in West Baltimore. *Id.* After games, Coach Booth and his staff would stay until the last child was picked up by a guardian. *Id.*

B.       The Morgan Bus Incident.

On Saturday, January 11, 2020, Dunbar played in the 24th Annual Basketball Academy, sponsored by Baltimore City Public Schools and held at Morgan State University ("Morgan"). *Id.*, ¶**67**. A bus transported the varsity and junior varsity teams, student managers, and coaches from Dunbar to and from the game site. On the bus ride back to Dunbar, a male student athlete allegedly touched sexually one of the female student managers as part of what was allegedly a consensual encounter. *Id.* Although Coach Booth was among those people on the bus, he was unaware for weeks that the incident had occurred.[2] *Id.*

Coach Booth only learned about the incident when another female student manager told him before practice two weeks later, Saturday, January 25. *Id.*, ¶**68**. Immediately after the practice that day, Coach Booth called the accused male student athlete into his office, and the student athlete confessed. *Id.*, ¶**69**. Coach Booth suspended the student athlete from the team until further notice

<hr>

[2] Defendants state that Coach Booth did not return from Morgan on the bus. **Defs. Memo. at 9, 13, n. 5**. Discovery will show that this is yet another fact that the Defendants get simply wrong.

and told him that the administration would be notified. *Id.* Coach Booth did not talk that day to the female student manager who was involved because she was not at practice. *Id.*

As soon as Coach Booth was able to finish his other coaching obligations, he called Dunbar Asst. Principal Lawrence Williams to report what had happened on the bus from Morgan. *Id.*, ¶70. Williams instructed Coach Booth to write up a statement, but Williams expressed concern because, while the student athlete had admitted to the incident, the events had not been corroborated. *Id.*[3] Coach Booth understood this to be a directive to speak to the female student manager and learn more. *Id.*

Coach Booth did not see the manager for three days, until Wednesday, January 29, when he saw the female manager in the study hall. **Cpl. ¶71,72.** Coach Booth called the manager out of the study hall and expressed concern at what he understood to have happened on the bus. *Id.* The student manager acknowledged the incident and its consensual nature. *Id.*, ¶73. Coach Booth informed the student manager that she would be suspended from the team until further notice and that he would notify her parents and the administration. *Id.*

Satisfied that he had corroborated the incident, Coach Booth drafted a statement and delivered it to Williams that day. *Id.* Coach Booth also called the female manager's mother who expressed her concern but appreciation to Coach Booth, and her agreement and understanding of the decision to remove the female manager from the team. *Id.*[4]

The following morning of Thursday, January 30, Reeves wrote an email to Coach Booth requesting a meeting that afternoon, and Coach Booth met with Reeves in her office along with Williams at 3:30 p.m. *Id.*, ¶¶74, 75. As Coach Booth entered the meeting, the female manager's

---

[3] In another dispute of facts, Defendants claim Coach Booth failed to give Williams details. Discovery will show that the call lasted a full five minutes was as detailed as it could be. **Ex. 5.**

[4] The female student manager's mother had attended Dunbar when Coach Booth was a student there and often praised and thanked Coach Booth for his efforts. *Id.*

mother was exiting Defendant Reeves's office. The mother was visibly pleasant and appreciative of Coach Booth. *Id*. During Coach Booth's meeting with Reeves and Williams, Reeves chastised Coach Booth for failing to bring the matter to the attention of the "administration." **Cpl., ¶76**. Coach Booth explained that he had informed Williams immediately when Coach Booth learned of the event, and Williams agreed and admitted that he had failed to bring the issue to Reeves's attention. *Id.*, **¶¶76-78**. Reeves then revealed that she had known about the event two days before this meeting, when the student athlete had called Reeves on her cell phone and described the event, using a graphic term. *Id*. Reeves instructed Coach Booth to take no further action. *Id.*, **¶77**.

     C.     <u>The Firing and the Defamation.</u>

On Thursday, February 6 and nearly a month after the bus incident, Coach Booth received a message through Reeves that Daryl Kennedy, the Instructional Leadership Executive Director for Baltimore City Public Schools, wanted to see Coach Booth in Kennedy's office at North Avenue at 3:30 p.m. on Monday, February 10, an afternoon scheduled for team practice. *Id.*, **¶84**.

During this meeting, which Reeves also attended, Kennedy handed Coach Booth a letter signed by Jones and dated February 7, 2020, informing Coach Booth that "Serious allegations have been made in connection with [his] duties as the boys' basketball coach at Dunbar …"; that he would "no longer be permitted to report to Baltimore City Public Schools for work, interact with the team or attend Dunbar's boys' basketball games until advised in writing otherwise"; and that he was "directed not to have any contact, whether in person or by phone, email, or by other means of communications, with any students (or their families) or staff of Baltimore City Schools Athletics Office." *Id.*, **¶85**. Given that Coach Booth's duties under his contract were to serve as Dunbar's boys' basketball coach, the letter only can be understood as a firing. *Id.*, **¶5, 10, 88-94**.

Reeves, seizing upon the fact that Coach Booth would be at headquarters and not at Dunbar's then-scheduled practice, directed Dunbar's Athletic Director to hand to the team a letter from Reeves addressed to the entire Dunbar community, which was simultaneously delivered by "robocall" email to the entire Dunbar community. *Id*. **¶88**. The letter, which is at the core of the dispute here, stated in relevant part:

> Coach Keith Booth ***will no longer*** serve as Dunbar's boys' basketball program [sic], effective Feb. 10, 2020. ***The action was taken as a result of*** a personnel matter ***currently under investigation by the Baltimore City Public Schools***.
>
> Please know we will always act in the ***best interests of our students and community***. Out of respect for ***Coach Booth's due process rights*** as an employee, we are unable to share ***details of the investigation***. We are hopeful of concluding the matter quickly and, again, ***in the best interest of our students***.
>
> In the meantime, we strongly encourage everyone to avoid ***speculation and gossip in the matter***. …

*Id*., **¶89; Ex. 7** ("the Reeves Letter") (emphasis added).

The Reeves Letter emphasized the supposed threat that Coach Booth posed to the best interests of students by stating it twice in just three, short paragraphs. *Id*., **¶91**. The issue was sufficiently severe to be, according to the Reeves Letter, the subject of an ongoing investigation, to merit concerns about due process (plainly understood to be associated with potential criminal liability), and to be something for speculation and gossip. *Id*. In short, readers of the Reeves Letter would, and did, reasonably infer that Coach Booth was fired for having committed a heinous act involving children. *Id*. As Dunbar parent, Shawntay Stevenson, stated, "When I first read the letter, I'm reading it and I'm, like, well, did he do something to somebody's child or something?" *Id*., **¶93;** *see* **Ex. 14.**

The Reeves Letter was <u>*false*</u>: Coach Booth did <u>*not*</u> pose a threat to the best interests of students, he was <u>*not*</u> the subject of an investigation – especially one to merit concern about his due

process rights, there was *no reason for speculation and goss*ip about Coach Booth, and he had committed *no heinous acts*. *Id*., ¶92. Moments after leaving the meeting with Kennedy and Reeves, however, Coach Booth received calls from friends and parents of his players, asking if he knew that he had been accused of harming students or that he had been fired. **Cpl., ¶93**.

Within hours, *The Baltimore Sun* had posted an article headlined: "Former Dunbar and Maryland star Keith Booth fired as Poets boys' basketball coach during first season." *Id*., ¶94. Other news outlets similarly posted the story as breaking news. For example, on February 10, WBAL posted the headline: "Baltimore basketball legend Keith Booth fired as alma mater's coach." *Id*.; *see* **Ex. 8**. *The Baltimore Sun* article, which appeared the next day in the print, noted that *The Sun* had obtained a copy of the Reeves Letter and quoted its defamatory contents. *Id*., ¶94; Ex. 9.[5] *The Baltimore Sun* went on to report that "Baltimore City Public Schools issued a statement Tuesday **confirming Booth's dismissal** … ." **Cpl. ¶94; Ex. 10** (emphasis added).

Other media outlets posted similar articles reporting of Coach Booth's firing. On February 11, 2020, WJZ TV posted an article entitled: "Former Terrapins Star Keith Booth Fired As Dunbar High School's Head Basketball Coach." *Id*., ¶94; **Ex. 11**. The next day, WBAL expanded its story to include interviews of Booth and parents, but the school system demurred when asked to comment. *Id*., ¶94; *see* **Ex. 12**. Defendants never offered or sought any corrections to the reports of the "firing" of Coach Booth. *To the contrary, they confirmed it*. *Id*., ¶94; **Ex. 10**.

D.     The Deprivation of Coach Booth's Due Process Rights.

Based on the content of the Reeves Letter and Jones' letter of February 7, Coach Booth's counsel sent Jones a letter on February 13 requesting a statement of charges and an opportunity to

---

[5] Exhibit 9 underscores the fact, disputed by Defendants, that *The Baltimore Sun* obtained the Reeves Letter the day Defendants distributed it to the Dunbar community and before Coach Booth was compelled to defend himself publicly.

be heard, citing Section 6-202 of the Education Article of the Maryland Code. *Id.*, ¶95; **Ex. 14**. Jones, who as the Director of Labor Relations & Negotiations in the Office of Human Capital for Baltimore City Schools is the Board's and Santelises' designee, responded on February 18, stating:

> The letter from my office to Mr. Booth placed him on leave from the position of head basketball coach, he has not been terminated. ***Since, Mr. Booth has not been terminated, Section 6-202, subsection (2) of the Education Article of the Annotated Code of Maryland is not applicable***. ***City Schools has not investigated the allegations***; therefore ***Mr. Booth has not been charged***. It is the practice of City Schools that if an employee is interviewed because of an allegation the employee has the right to have a representative present during the interview. This process will afford you an opportunity to represent the interest of Mr. Booth in the interview prior to the issuances of any charges.

*Id.*, ¶97; **Ex. 15** (emphasis added). This letter directly conflicts Defendants' other statements, *i.e.*, the statement in the Reeves Letter that the matter was under investigation and that Coach Booth had been dismissed. *Id.*, ¶98. The contention that Coach Booth had not been terminated, investigated or charged was a contrivance designed to deprive improperly Coach Booth of his rights to protect himself and clear his name. *Id.* And, Defendants now state that they had no intention of ever investigating, despite the falsehood in the Reeves Letter. *See* **Jones Decl. ¶ 9**

As of the date of the filing of the Complaint, Coach Booth had heard absolutely nothing further from Defendants. *Id.*, ¶100. He has been given no opportunity to be heard or to clear his name. Coach Booth is left unemployed and defamed. *Id*. Notwithstanding a timely request through undersigned counsel, he was denied a hearing and a change to defend himself. *Id.*

F. Defendants' Previously Unstated and False Justifications for Firing Coach Booth.

Through Defendants' Memorandum, Coach Booth learned for the very first time seemingly what he would have learned had Defendants afforded him the process he was due, to include a statement of charges and a hearing. Defendants are now using certain events, not of Coach Booth's fault or making, as a pretext for his termination.

First, Defendants claim that "Mr. Booth wanted to run Dunbar's basketball program his way without any input or influence from any prior Dunbar coaches or members of Dunbar's alumni association." **Defs. Memo., 7, 9**. In reality, had Coach Booth been afforded the opportunity to defend himself and clear his name, he would have shown that, upon being hired, he reached out to the entire Dunbar community and worked well with former head coach and alum Cyrus "Diego" Jones, and other alumni like Sam Cassell. Coach Booth only ran into difficulty when certain alumni placed their loyalty to the former head coach above the best interests of Dunbar's student athletes. **Cpl., ¶¶58, 59, 60-66, 80**.

Second, Defendants point to the fact that Coach Booth, during the summer before he was formally under contract, worked with four Dunbar student athletes at a time when the rules only allow coaches to work off season with two players at a time. **Defs. Memo., 7**. If this was a failure, then it was a failure of Dunbar's athletic director, who, as discovery is expect to show: (a) was the one who indicated to Coach Booth that he could work with students four at a time, (b) opened Dunbar's gymnasium for those workouts, and (c) was present and observed those workouts.

Third, Defendants cite to a coaches' meeting in October 2019, during which Coach Booth, clearly believing he had not broken any rules, admitted that he had worked with students four at a time. **Defs. Memo., 7**. Defendants claim that "Mr. Booth was involved in a heated exchange" at the meeting. **Id.** However, discovery will show that Coach Booth acted professionally, didn't cuss or raise his voice and, along with several athletic directors, was thanked by fellow coaches for "speaking their truth and starting a long overdue conversation." **Ex. 17**.

Fourth, Defendants state that "Mr. Booth was upset with Ms. Johnson because Dunbar was scheduled to host a winter basketball tournament in which the Dunbar team was not scheduled to participate." Actually, the opposite was true. Certain alumni, and perhaps Ms. Johnson, were upset

with Coach Booth because he discovered that Ms. Johnson had not obtained authorization from school administration concerning the weekend use of the Dunbar gymnasium for a basketball tournament. **Cpl. ¶¶64-65**. The tournament, known as the "Baltimore-DC Challenge," was moved to Forest Park High School. ***Id.***; *see* **Ex. 18**.

Fifth, Defendants raise the fact that "Mr. Booth signed the Dunbar basketball team up for the Demantha [sic] Basketball Christmas Classic … ." **Defs. Memo., 8**. According to Defendants, "This tournament was unsanctioned by the MPSSAA, and thus, signing Dunbar up to participate was a direct violation of MPSSAA rules." ***Id.*** Curiously, one month after the tournament, Coach Booth was censured by Tiffany Byrd, the Coordinator of Athletics for Baltimore City Public Schools, and <u>*not*</u> the MPSSAA. Ms. Byrd informed MPSSAA of the City's belief that the DeMatha tournament was not sanctioned, and <u>*not*</u> vice versa. **Ex. 19**. Even DeMatha did not know that its tournament needed sanctioning, and it accepted responsibility for this oversight. **Ex. 27**. Discovery will reveal, further, that Dunbar's Athletic Director approved and promoted Dunbar's participation in the tournament. **Exs. 20, 21**. Only Coach Booth, however, was censured when other MPSSAA schools, such as Baltimore Polytechnical Institute (a Baltimore City public school) and Bowie High School, participated in the same tournament the year prior without sanction. Far from serving as a basis for dismissal, the factual questions surrounding the DeMatha Tournament give rise to questions concerning Defendants' true motivation conduct, which can only be answered by a fulsome discovery process.

Defendants also point to circumstances concerning Coach Booth's ejection from one of the DeMatha games due to Coach Booth's response to a missed call. **Defs. Memo. at 8**. Discovery will show that Dunbar's Athletic Director thanked Coach Booth for his passion for his team and understood Coach's Booth's frustration of the officiating. *See* **Ex. 22** ("I've been there before"). This is hardly grounds for a dismissal.

Sixth, Defendants claim that they "could impose discipline, up to and including termination of employment and/or contract" based on the fact that Coach Booth failed to follow BCBSC's Policy JBB, Administrative Regulation JBB-RA, which allegedly required him to report the Morgan bus incident within one day to the school principal or designee. **Defs. Memo., 13**. The first time that Defendants presented such policies to Coach Booth, or referred to them as a basis for dismissal, was as exhibits to Defendants' Memorandum in this case. **Cpl., ¶36, 85, 97**. Even without the benefit the regulations, however, Coach Booth complied by telephoning the school principal's assistant, Williams, promptly after learning of the incident and reporting all that he knew. **Cpl. at ¶¶69-70**. Williams never informed Coach Booth of any obligation to inform "the school principal or designee" nor did Williams indicate that he was not such a designee. There is no dispute that Williams failed to promptly inform Reeves of what he learned. **Cpl. at ¶78**. The regulation Defendants now cite should have applied equally to Williams – it did not.

Seventh, Defendants accuse Coach Booth of displaying "an inappropriate attitude" during a meeting that Reeves scheduled with students' parents on Friday, January 31 just before a scheduled game. **Defs. Memo., 10**. Had Coach Booth been afforded the opportunity to clear his name, he would have shown that Reeves's self-serving accusation, like the Reeve's Letter, was false. **Cpl., ¶79; Ex. 16**. He would have been able to call the parents as witnesses to show that he politely excused himself and displayed an appropriate attitude to parents during the meeting and at all time. *See* **Cpl., ¶68**.

## Argument

### A.     The Board Can Be Held Liable in a 42 USC § 1983 Case.

The Board is, by law, a municipal entity. Md. Code Ann., Educ. § 4-302. As such, it may be liable under 42 U.S.C. § 1983 for "the execution of a policy or custom of the municipal entity

caused the violation of the plaintiff's constitutional rights." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). A municipal entity can be responsible for violations of § 1983 when the alleged deprivation was caused by individuals "'whose edicts or acts may fairly be said to represent official policy.'" *Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000) (citing *Monell*, 436 U.S. at 694).

Municipal liability under § 1983 attaches where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). In *Pembaur*, municipal liability attached when a county prosecutor, based on a flawed understanding of the law, instructed sheriffs to serve writs at a clinic by forcibly (and unconstitutionally) entering that clinic. Because the sheriffs sought supervisor direction, causing the violation, the clinic had a cause of action against the county. *Id.*

First, the letter ascribed to Reeves is central to the allegations related to Counts 2-4 against the Board. Although Reeves is alleged to have written the letter, it "was approved by various individuals in the school system and delivered with the approval of the school system electronically through the school's technology group to a distribution list." **Cpl. ¶¶88, 117; Ex. 13**. *Cf. Owen v. City of Independence, Mo.*, 445 U.S. 622, 626-29, 633 & n. 13 (1980) (upholding stigma-plus claim against municipality, where stigmatizing statements were made in private by official and were released to public by another municipal actor).

Second, Jones, the Director of Labor Relations & Negotiations in the Office of Human Capital for Baltimore City Schools and a designee for Santelises and the Board, gave the final decision, based on his interpretation of the law and Board policies, do deny Coach Booth's request to be advised of the charges against him and for a hearing to clear his name. **Cpl. ¶¶22, 95-100**.

There is little question that Defendants made "a deliberate choice to follow a course of action … from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483.

The cases Defendants cite are distinguishable from *Monell* and *Pembaur* in that they do not address § 1983 claims, for which the Supreme Court has held municipal liability may attach. In the only case that Defendants cite under § 1983 jurisprudence, the Supreme Court clearly stated, "a municipality was a person under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 62 (1989) (reaffirming *Monell*).

**B.     The Complaint Alleges Facts to Establish a Deprivation of Coach Booth's Liberty Interests Without Due Process.**

The Fourteenth Amendment of the United States Constitution prohibits States from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. As the Complaint alleges Defendants deprived Coach Booth of his job, his title and his freedom to seek future employment without stigma without so much as a statement of charges or any opportunity to clear his name.

It is well understood that "a Fourteenth Amendment 'liberty interest is implicated by public announcement of reasons for an employee's discharge.'" *Sciolino v. City of Newport News*, 480 F.3d 642, 645-46 (4th Cir. 2007) (quoting *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990)). "Public employees, even when lawfully discharged, enjoy the 'freedom to take advantage of other employment opportunities' and to 'be 'free from arbitrary restrictions upon the opportunity for other gainful employment stemming from the reasons voluntarily given by government for lawfully terminating ... at-will public employment.'" *Cannon v. Vill. of Bald Head Island*, 891 F.3d 489, 501 (4th Cir. 2018) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972)).

To state this so-called "stigma-plus" claim, a plaintiff must establish (1) "that he has been deprived of a liberty interest" and (2) "that he was deprived of such interest without due process, which in this context involves notice and an opportunity to clear the plaintiff's name." *Cannon*, 891 F.3d at 501-02. In this case, there is no serious contention whether Coach Booth has plead or can establish the second element, *i.e.*, that he was provided no notice nor an opportunity to clear his name. **Cpl. ¶¶95-100**. Defendants do not contest this fact; they simply argue that he was not so entitled. **Defs. Memo. 27-30**. Thus, the only issue this Court must face is the first element: whether Coach Booth had a viable liberty interest.

In order to plead and establish a protected liberty interest such that notice and opportunity for a name-clearing hearing are required, "a plaintiff must allege that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination **or demotion**; and (4) were false." *Sciolino*, 480 F.3d at 646 (emphasis added). Plaintiff can easily satisfy these elements.

### (1)    The Reeves Letter Placed a Stigma on Coach Booth's Reputation.

"'For over thirty years, [the United States Court of Appeals for the Fourth Circuit] has held that a governmental disclosure places a stigma on a former employee sufficient to give rise to a liberty interest claim if it implies the existence of serious character defects such as dishonesty or immorality.'" *Cannon*, 891 F.3d at 502 (alterations in original; citations omitted in original). In assessing liberty interest claims, Courts "distinguish[] statements that *imply such serious character defects* from statements that simply allege incompetence." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 308 (4th Cir. 2006) (citations omitted in original; emphasis added).

The case of *Socol v. Albemarle Co. Sch. Bd.*, 399 F.Supp.3d 523, 539 (W.D. Va. 2019) is highly instructive.  In *Socol*, the school system's Chief Technology Officer ("CTO") was accused

of misusing school a "purchase card" for his personal benefit. *Id.* at 531-32. Upon firing the CTO, the school system's superintendent made a statement informing individuals with whom the CTO worked of the termination and the reasons for it. *Id*. at 533, 538. The school system also issued a press release that simply stated that the CTO "was 'no longer ... employed by the school division.'" *Id*. at 533. The CTO sued alleging that the statement and the press release deprived the CTO of his liberty interests without due process. *Id*.

With respect to the statement, the Federal District Court in Virginia, applying Fourth Circuit law, denied Defendants' motion to dismiss and allowed the stigma-plus claim to go forward. As the Court stated:

> Viewing the allegations in the light most favorable to the plaintiff, the court concludes that [the superintendent's] statement regarding the alleged basis for [the CTO's] termination did more than suggest that [the CTO] was incompetent as CTIO. Instead, by indicating that [the CTO] deliberately and egregiously misused purchase cards, [the school' superintendent] *insinuated* that [the CTO] engaged in dishonest conduct and therefore *implied the existence of a serious character defect. See Cox v. N. Va. Transp. Comm'n*, 551 F.2d 555, 557-58 (4th Cir. 1976) (affirming the trial court's determination that the plaintiff's liberty interest was infringed when her employer publicly linked her discharge to an investigation of financial irregularities, thus "*insinuating* dishonesty"); *McNeill v. Butz*, 480 F.2d 314, 319-20 (4th Cir. 1973) (concluding that federal employees' liberty interests were *implicated* by charges that "smack[ed] of deliberate fraud" and "in effect allege[d] dishonesty").

*Id*. at 538. The Court decided that the press release did not give rise liability because – unlike here – the release did "not provide any reasons for the termination," did no more than "simply report" that the CTO "was no longer employed by the School System" and "included no additional statements that would imply the existence of serious character defects." *Id*. at 539.

The Reeves Letter is not nearly as innocuous as the press release in *Socol* and more stigmatizing than the *Socol* statement. The Reeves Letter falsely stated that Coach Booth was

"currently under investigation by the Baltimore City Public Schools" when he was not, and that Coach Booth was being removed as the head coach of the Dunbar boys' basketball team to serve "the best interests of our students and community" when he did nothing counter to those interests. **Cpl., ¶89; Ex. 7**. Far from "simply reporting" that Coach Booth was no longer the head coach, the Reeves Letter raised the specter of "speculation and gossip," as if there were something to speculate and gossip about regarding Coach Booth. ***Id.*** Readers of the Reeves Letter understood it to imply that Coach Booth had committed some harmful or heinous act involving children. **Cpl. ¶¶90-93; Ex. 10**. This is certainly an accusation of a "serious character defect" that gives rise to Coach Booth's due process rights of notice and opportunity to clear his name. *Socol*, 399 F.Supp.3d at 539; *see also Wilcox v. Newark Valley Cent. School Dist.*, 904 N.Y.S.2d 523, 258 (3d Dep't 2010) (principal's mere statement to sports team student athletes and their parents that teacher/coach, who subject of gossip of sexual misconduct, had acquiesced to termination was sufficiently stigmatizing and damaging to reputation, establishing stigma-plus claims under both state and federal law) (citing *Velez v. Levy*, 401 F.3d 75, 88–89 (2d Cir. 2005); *Donato v. Plainview–Old Bethpage Cent. School Dist.*, 96 F.3d 623, 631 (2d Cir. 1996)).

(2)   The Reeves Letter was Made Public by the Employer.

Defendants certainly cannot deny that the Reeves Letter was handed directly to players and distributed by email to the entire Dunbar Community and beyond. **Cpl., ¶¶88, 135**. Defendants contend instead that they should be absolved of liability because ***two days after*** the news of the firing and wide reporting of the Reeves Letter, Coach Booth sat for an interview in an effort to mitigate his damages. **Defs. Memo., 26**. There is no law to support this contention.

Defendants cite *Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1153 (10th Cir. 2001), to support their proposition that Coach Booth's efforts to protect himself somehow

absolves Defendants of their constitutional violations. *See* **Defs. Memo., 26**. The facts in *Stidham* bear no resemblance to this case. In *Stidham*, a peace officer could not find work because his former employer stated in response to reference checks that the peace officer had "raped a young girl, assaulted a… resident, resigned from his position … under threat of termination, and was 'at risk' as a peace officer." *Stidham*, 265 F.3d at 1149. The peace officer brought suit, alleging that defendants "effectively revok[ed] his certificate as a peace officer and foreclos[ed] his employment opportunities" without due process. *Id*. The Court <u>*upheld*</u> the peace officer's due process claim with respect to his property right in his certificate. *Id*. at 1153. The Court denied the police officer's due process claim with respect to his reputation because, unlike the Reeves Letter, the statements were made privately and well after the peace officer had resigned. *Id*.

Defendants also cite to *Mitchell v. Glover*, 996 F.2d 164 (7th Cir. 1993), to support their factually disputed argument that Defendants did not disseminate the allegedly damaging information. **Defs. Memo., 26-27**. In *Mitchell*, a college and its president fired a registrar "in a very professional and private manner." *Id*. at 167-68. There was no letter addressed to the entire community. The information concerning the reasons for the termination became public when a third party confronted the college president at a meeting of faculty and administrators. *Id*. *Mitchell* is likewise devoid of anything close to the facts surrounding the Reeves Letter.

(3)    The Reeves Letter was Made in Conjunction with Coach Booth's Termination and/or Demotion.

Defendants further argue that they should be absolved of liability because they merely placed Coach Booth on leave until his contract expired, citing inapplicable law from another Circuit.  Defendants proffer elements from *Cotton v. Jackson*, 216 F.3d 1328, 1330 (11th Cir. 2000), that are more limited than governing jurisprudence from the U.S. Court of Appeals for the Fourth Circuit and silent about demotions. In <u>*this Circuit*</u>, Defendants may be liable for "a public

employer's stigmatizing remarks … made in the course of a discharge ***or significant demotion***." *Ridpath*, 447 F.3d at 309 (quoting *Stone v. Univ. of Md. Med. Sys. Corp.,* 855 F.2d 167, 172 n. 5 (4th Cir.1988)) (emphasis added); *Sciolino*, 480 F.3d at 646. Regardless of Defendants' contrivance concerning whether their actions constituted a "firing" or "leave," there is no disputing that the Reeves Letter informed the Dunbar community that Coach Booth "***will no longer serve*** as Dunbar's boys' basketball program," which under any understanding is a significant demotion, if not a firing. **Cpl. 89, ¶, Ex. 7**.

Indeed, even courts outside the Fourth Circuit have held that stigmatizing statements made in conjunction with decisions <u>*not to renew*</u> an annual teaching contract, like here, give rise to protected liberty interests. *McGhee v. Draper*, 564 F.2d 902 (10th Cir. 1977). In *McGhee*, a nontenured teacher's year-to-year contract was not renewed due to community gossip and rumors that she was a "sexpot" and immoral. *Id*. at 906. The school board decided not to renew the contract without allowing the teacher the right "to confront her accusers or afforded a due process hearing to clear her good name." *Id*. After the District Court granted a directed verdict for the school board and other defendants, the Circuit Court reversed, stating "where the potential of a stigma or disability to take advantage of further employment is involved, reasonable notice of the substance of the charges to be considered is required." *Id*. at 911 (citing *Willner v. Committee on Character*, 373 U.S. 96, 105 (1963); *Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970)); *cf.*, *Miller v. Baltimore City Bd. of School Com'rs*, 833 F. Supp. 2d 513 (2011) (due process violation in context with choice between leave or demotion).

Whether he was fired, demoted or simply not renewed, Coach Booth suffered stigmatizing statements in conjunction with Defendants' employment action that "seriously damage his standing and associations in his community." *Roth*, 408 U.S. at 573; *see also* **Cpl. ¶100, 115, 116,**

120 (noting Coach Booth is unemployed and harmed by, among other items, loss of future wages). Even Defendants admit "an in-season coaching change is significant … ." **Defs. Memo., 33**. As the Supreme Court has stated: "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971).[6]

(4)    The Reeves Letter was False in Fact and by Insinuation.

As the Complaint plainly alleges, the Reeves Letter "was false" both on its face and by "insinuation." *Cox*, 551 F.2d at 557-58; *McNeill*, 480 F.2d at 319-20; **Cpl. ¶¶90-93**. On its face, the Reeves Letter stated plainly that "The action [to remove Coach Booth as head coach] was taken as a result of a personnel matter currently under investigation by the Baltimore City Public Schools" when Jones admitted "City Schools has not investigated the allegation." **Cpl. ¶¶89, 97; Exs. 7, 15**. And, now we know Defendants had no intent to investigate. **Jones Decl. ¶ 9**. As discussed repeatedly above the Reeves Letter was understood to imply and insinuate that Defendant Booth had committed a heinous act involving children. **Cpl., ¶90-91**. Defendants dance on the head of a pin when they attempt to re-cast the Reeves Letter as a "standard" and "normal" letter that was true. **Defs. Memo., 4, 30**. It was anything but that. It was a letter that needed the approval of both the central public relations and legal departments. **Cpl., ¶88; Ex. 13**.

Defendants further attempt to seize upon a statement that Coach made in a television interview, which he felt compelled to give after the Reeves Letter was acquired by, and quoted in,

---

[6] Defendants cite Seventh Circuit authority for the proposition that their dissemination of Defendants' Letter must make it "virtually impossible" for the employee to find a new position in his chosen profession. **Defs. Memo. at 25**. This is not the standard adopted by the U.S. Court of Appeals for the Fourth Circuit. *See e.g., Cannon*, 891 F.3d at 501 (due process violation arises from statements that place "arbitrary restrictions upon the opportunity for other gainful employment"). Regardless of the standard, Coach Booth is unemployed (**Cpl., ¶ 100**), and this raises issues of fact that cannot be decided at this time or without discovery.

*The Baltimore Sun*. **Defs. Memo., 13**. In that interview, Coach Booth, quite honorably, stated that he was the leader of his basketball program and felt "full responsibility for as a leader of the program for whatever takes place in that program." This noble statement is far from being an admission that the Reeves Letter was true. As Coach Booth said relevant to this matter:

> I just want to make it clear for the record there was/is no reason to speculate or gossip about anything as it pertains to myself in regards to this incident or the situation with me getting fired. **…** ***I followed what I deemed to be proper protocol in terms of handling that situation***. …

As Coach Booth stated, he did nothing wrong with respect to the Morgan bus incident. Despite what the Reeves Letter plainly implied, Coach Booth never posed a threat to the best interests of students, he was not the subject of an investigation, especially to merit concern about his due process rights, there was no reason for speculation and gossip about Coach Booth, and he had committed no heinous acts. **Cpl. ¶91**.

### C. The Complaint Alleges Facts to Establish a Deprivation of Coach Booth's Property Interests Without Due Process.

Defendants argue, first, that Coach Booth failed to plead facts that would show he has a constitutionally-recognized property interest in his continued employment. Second, Defendants argue that Coach Booth failed to plead facts that would show that available remedies under state law are inadequate. At this early stage of the litigation, both arguments are without merit.

First, "[i]n the context of employment in public education, the independent source for the property interest has been said to be a contract ... . [W]here the employee has a legitimate entitlement to continued employment do the requirements of due process attach." *Royster v. Bd. of Trs.*, 774 F.2d 618, 620-21 (4th Cir. 1985) (holding school superintendent had property interest, premised on his contract, through end of that contract). The Complaint plead facts sufficient to

show a plausible claim that Coach Booth was legitimately entitled to continued employment through the end of his contract, which he was denied.

Defendants essentially concede the facts that would support the existence of a cognizable property interest: Coach Booth was "well within the terms of his written, employment contract with the Board" when Defendants unconstitutionally deprived him of his right to continued employment through the end of that contract. **Cpl., ¶¶84-86, 90; Defs. Memo., 22**. Defendants attach a copy of this contract to their Memorandum, which states that it is binding "***for the above-named school year and sport season***." **Defs. Memo., 22 & Ex. 1**. When Coach Booth was terminated, neither the sport season nor the school year had concluded. Defendants appear to have assumed, without citing to any authority, that continued employment can only give rise to a property interest when it is contract to contract. Such is not the case. *Royster*, 774 F.2d at 620-21.[7]

Defendants seek further to relieve themselves of the consequences of their unconstitutional actions by raising their technical argument that Defendants did not fire Coach Booth, but merely placed him on some sort of "leave" until his contract expired. Placing an employee on indefinite leave and forcing a termination may be the basis for a due process violation. *See Miller*, 833 F. Supp. 2d at 513 (another case involving Jones). In *Miller*, Baltimore City Public Schools placed a cafeteria manager on leave because she was suspected of misappropriating cafeteria funds. *Id*. at 515. Just has he did here, Jones, who was a defendant in *Miller*, told the cafeteria manager, "there was and would be no investigation of the allegations against [the manager] … ." *Id*. Instead, Jones gave the manager the choice of accepting a demotion with reduced pay and hours or remaining on indefinite suspension. *Id*. Judge Quarles had no difficulty in determining that this action deprived

---

[7] The contract further provides that Coach Booth was to receive an evaluation at the end of the season and, if that review was "unsatisfactory" then "the coach may not be retained for subsequent seasons in the same sport." This creates the expectation that with a satisfactory review the coach would be retained, particularly when combined with the common practice for such coaches.

the cafeteria manager of her property rights and denied Jones's and the School Board's motion to dismiss. *Id.* at 517.

Second, Defendants misapprehend the case law when they argue, in the infancy of this litigation, that Coach Booth failed to "prove that state damage remedies are inadequate." Defs. Memo., 23. "The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." *Zinerman v. Burch*, 494 U.S. 113, 124 (1990). The so-called *Parratt-Hudson* doctrine does not apply, however, when the complained-of deprivation results from enforcement of "established state procedures," rather than by "random and unauthorized acts." *Hudson v. Palmer*, 468 U.S. 517, 532 (1984). Here, the Complaint sufficiently alleges that the deprivation was as a result of a policy that individuals are only entitled to a statement of charges and a hearing if an investigation takes places. **Cpl., ¶¶95-100; Ex. 15**.

Through counsel, Coach Booth sought due process at an administrative level to include a statement of charges that would have supported his termination and right to be heard. He was denied such an opportunity. Notwithstanding Defendant Reeves' statement in the defamatory letter that Coach Booth had been terminated "as a result of a personnel matter currently under investigation," Jones wrote that the Board had "not investigated the allegations" against Coach Booth. **Cpl., ¶¶84-86, 90, 97**. Because there had been no investigation, Jones further explained (flatly contradicting Defendant Reeves) that Coach Booth was not entitled to a statement of charges or a hearing to present witnesses. **Cpl., ¶¶89, 97; Ex. 15**. Defendant Jones offered Coach Booth no other avenue for recourse, making administrative and state level remedies inadequate. *Contra Hamilton v. Mayor & City Council of Baltimore*, 807 F.Supp.2d 331, 361 (D. Md. 2011) (citing *Zinerman*, 494 U.S. at 125-26).

**D.** **The Individual Defendants are Not Entitled to Qualified Immunity for Violations of Clearly Established Constitutional Rights.**

Qualified immunity protects government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The burden of proving the defense "rests on the party seeking to invoke it." *Wilson v. Prince George's Cty.*, 893 F.3d 213, 219 (4th Cir. 2018)). To prevail under this defense, the defendant must "show either that there was no constitutional violation or that the right violated was not clearly established." *Gregg v. Ham*, 678 F.3d 333, 347 n.7 (4th Cir. 2012) (citing *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc)). "[A] constitutional right is clearly established when 'its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Ridpath*, 447 F.3d at 313.

It is audacious and disingenuous for Defendants claim that Coach Booth's right to a name clearing hearing is not clearly established given the plethora of case law and statutes on point and his timely request for a hearing. *See, e.g., Miller*, F. Supp. 2d 513 (involving Jones). At the time of Coach Booth's removal "it was clearly established that '"notice and an opportunity to be heard are essential" when a public employee's liberty interest is infringed by a charge implying such serious character defects as "dishonesty[ ] or immorality" lodged in the course of an injury such as failure to rehire."'" *Socol*, 399 F. Supp. 3d at 541 (quoting *Ridpath*, 447 F.3d at 313 & *Roth*, 408 U.S. at 573).

In *Ridpath*, the Fourth Circuit denied claims of qualified immunity brought by administrators and athletic coaches of a public university in defense of claims by the school's former athletic administrator. *Ridpath*, 447 F.3d at 300. The administrator alleged due process violations of his liberty interests based upon false reporting to the NCAA that the administrator

had been transferred as a "corrective action," which implied wrongdoing related the school's violations of NCAA rules of which he had no part and merely reported. *Id*. at 309.

Here, even if the Court were to ignore the dismissal and summary judgment standards of review and only accept the undeniable express falsehood in the Reeves Letter – that Coach Booth was the target of "an investigation" by Baltimore City Public Schools when he was not – then this case still falls within the *Ridpath* facts. The innuendo implied by the Reeves Letter, *i.e.*, that Coach Booth harmed students, places this case falls squarely within *Ridpath* and a host of other cases. *See e.g. McGhee*, 564 F.2d at 906-11 (accusations of being sexually immoral); *Wilcox*, 904 N.Y.S.2d at 258-59 (innuendo of sexual misconduct); *Velez*, 401 F.3d at 90 (statements of purportedly "criminal" and "inappropriate behavior"). Indeed, Jones knew the basis for the constitutional violation, having been sued for it once before. *Miller*, 833 F. Supp. 2d at 513.

Defendants further knew of their obligation to allow Coach Booth to clear his name because, in additional to constitutional guarantees, a Maryland statute requires it. "***Before removing an individual, the county board shall send the individual a copy of the charges against him and give him an opportunity within 10 days to request a hearing***." Md. Code Ann., Educ., § 6-202. Board Policy is to the same effect. Ex. Defendants alluded to "serious allegations" in Defendant Reeves's letter and *The Baltimore Sun* widely reported the "firing" along with published statements from Reeve's Letter. It is difficult to accept that Defendants could not "envision an attempt to sue … for a constitutional violation." **Defs. Memo., 32**.

> ### E. Coach Booth Stated Causes of Action for Both Defamation *Per Se* And *Per Quod* When School Executives Blessed A False, Scurrilous Letter, Written by Defendant Reeves, For Circulation to The School and Beyond.

Maryland law recognizes two kinds of defamation: defamation *per se* and defamation *per quod*, each of which are sufficiently pled here. Defendants' conflate the legal and analytical

framework of the two, distinct causes of action. At issue is a letter related to Coach Booth's termination that was written and signed by Reeves and reviewed and approved by individuals who reported to Defendants Board and Santelises. *See, e.g.*, **Cpl. ¶2, 6-8, 88-92, 134-147; Exs. 7, 13**. The letter, addressed to "Dunbar High School Parents and Guardians," stated that Coach Booth had been removed from his position as the boys' basketball coach because of reasons "currently under investigation" and that more could not be shared because of his "due process rights," a phrase understood in common parlance to be associated with criminal matters. The letter ***twice*** emphasized that "the best interests of Dunbar students" made Coach Booth's termination necessary and advised people to "avoid specul[ation] and gossip," thereby further elevating the significance of the situation. ***Id.***

      a.     <u>Defamation *Per Se.*</u>

Defamation *per se* occurs where the "injurious nature" of the words is "a self-evident fact of common knowledge of which the court takes judicial notice and need not be pleaded or proved." *Metromedia, Inc. v. Hillman*, 285 Md. 161, 163 (1979) (quotation omitted). Harm is presumed and "a jury may award general damages for false words that are actionable *per se*, even in the absence of proof of harm." *Shapiro v. Massengill*, 105 Md. App. 743, 774 (1995).

When considering whether a written statement is defamatory, ***it must be read as a whole*** to determine whether a publication is defamatory in and of itself, or whether, in light of the extrinsic facts, it is reasonably capable of a defamatory interpretation[.]" *Chesapeake Publ'g Corp. v. Williams*, 339 Md. 285, 295 (1995). If a publication is capable of defamatory and non-defamatory meanings, the issue must be resolved by a finder of fact. *Embrey v. Holly*, 48 Md. App. 571, 581 (1981), *aff'd in part, rev'd in part*, 293 Md. 128 (1982). Significantly,

> "Words spoken of a person in his . . . ***trade, profession, business or means of getting a livelihood***, which tend to expose him to the

27

> hazard of losing his office, . . . and thereby tend to injure him in his trade, profession or business, are actionable without proof of special damage, even though such words if spoken or written of an ordinary person, might not be actionable *per se*."

*Shapiro*, 105 Md. App. at 776 (quoting *Kilgour v. Evening Star Newspaper Co*., 96 Md. 16, 23-24 (1902)). Defendants present an incomplete and incorrect legal standard.

Here, Defendant Reeves' letter essentially stated that Coach Booth had been terminated due to concerns that he had engaged in what would commonly be understood to be criminal conduct. A parent stated, as alleged in the complaint, "When I first read the letter, I'm reading it and I'm, like, well, did he do something to somebody's child or something?" **Cpl. ¶93**; **Ex. 12** The letter falsely states that the matter was still under investigation and falsely imputes that terminating Coach Booth was, emphatically, in the best interests of the students at Dunbar. Given Coach Booth's position at Dunbar as a coach, educator and role model, the content of the letter, when read as a whole, is defamatory *per se*.

This conclusion, grounded in the circumstances of Coach Booth as a coach and educator, is well supported by case law. *See, e.g., Wilcox*, 904 N.Y.S.2d at 527 (statement that teacher "should take a leave of absence 'for the safety of the students in the district' is subject to a defamatory interpretation that [the teacher] presents a risk of harm to the students in her care when a "reasonable listener could interpret the statement as implying plaintiff's possible participation in or awareness of [] crimes against the students, or as linking her to immoral and reprehensible conduct"); *Kumaran v. Brotman*, 617 N.E.2d 191, 202 (Ill. Ct. App. 1993) (statement that substitute teacher was "working a scam" could be defamatory *per se* given that "a teacher would be expected to set a good example and function as a role model for his young, impressionable students" and statement "prejudice[d] his teaching ability and integrity because it presented him as someone who would not be an acceptable role model for young students").

Coach Booth sufficiently plead a cause of action for defamation *per se* based on Defendant Reeves's letter, which was approved by individuals reporting to Defendants Board and Santelises. Given the lack of discovery and issues of disputed material fact, summary judgment further would be inappropriate at this stage of the litigation.

b.    <u>Defamation *Per Quod.*</u>

Defamation *per quod* occurs when the "injurious effect must be established by allegations and proof of special damages," more specifically such that the words "were defamatory, but it must also appear that such words or conduct caused actual damage." *Metromedia*, 285 Md. at 164. A plaintiff must prove: (1) the defendant made a statement to a third party tending to expose the plaintiff to public scorn, hatred, contempt, or ridicule; (2) the statement was false; (3) the statement was made with the requisite degree of fault; and (4) the plaintiff suffered harm. *Kairys v. Douglas Stereo, Inc*., 83 Md. App. 667, 678 (1990) (citing *Hearst Corp. v. Hughes*, 297 Md. 112 (1983)).

Without laying out the relevant legal standard or citing to any analogous case law, Defendants argue in summary fashion that Coach Booth is a public figure, rather than a private figure, such that he must prove the defamatory statements in Defendant Reeves' letter were made with actual malice. As previously explained, however, the letter tended to expose Coach Booth to public scorn, hatred, and ridicule by *inter alia* tarnishing his reputation as a coach and educator. The letter was false. And, as plead in the Complaint, Coach Booth suffered harm. The only issue is the standard of fault the Court should apply, were it to decide the matter on its merits; the Complaint plead sufficient facts to show negligence or actual malice. The appropriate standard is, however, negligence given Coach Booth's role in the community and this controversy.

"In order to trigger First Amendment implications, a defendant must show that the alleged defamatory statement related to a public official or a public figure, or is a matter of public

concern." *Hosmane v. Seley-Radtke*, 227 Md. App. 11, 22, *aff'd*, 450 Md. 468 (2016). A private person need only show that the source of the defamation acted negligently in failing to ascertain its defamatory character. *Jacron Sales Co., Inc. v. Sindorf*, 276 Md. 580, 596-97 (1976). In order to be considered a public figure, an "[t]he employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." *Rosenblatt v. Baer*, 383 U.S. 75, 86 n. 13 (1966).

At the time of his termination, Coach Booth was head coach of the boys' basketball team at Dunbar. He was not the athletic director of the high school. He was not an NBA coach or a college coach. He was an emergency, high school coach, hired under a one-year contract. *Contra A. S. Abell Co. v. Barnes*, 258 Md. 56, 66 (1970) (considering *Curtis Pub. Co. v. Butts*, 388 U.S. 130 (1967), and noting there "was no debate . . . as to whether Butts [was] a public figure[]" when "Butts was a nationally known football coach, then athletic director at a state university").

An individual should not be considered a public figure "[a]bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society." *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 352 (1974). To the extent that Coach Booth sparked attention, it was due to his past achievements at college and professional basketball levels, not the position that he occupied at Dunbar. As such, Coach Booth qualifies as a private figure. The conclusion is well supported by the case law. *See Warford v. Lexington Herald Leader*, 789 S.W.2d 758 (Ky. 1990) (concluding that an assistant basketball coach was not a public figure).

Nor should Coach Booth be considered a limited-purpose public figure, one who has "voluntarily injected himself or is drawn into a particular public controversy . . . for a limited range of issues." *Gertz*, 418 U.S. at 361. Coach Booth was the victim of publicity efforts of the

Defendants who created the public controversy and thrust Coach Booth into it. Here, Defendants delivered the Reeves Letter, working with the school's technology group, to a sizeable email distribution list in addition to those physical copies that were handed out. **Cpl., ¶88**. Before Defendant Reeves issued the letter and after consultation with others, district leadership noted the "high profile of the position" itself. **Ex. 13**. Along with the Reeves Letter, ***Defendants composed and issued a media statement***, which Plaintiff has never seen. ***Id.*** The Reeves Letter made its way to *The Baltimore Sun* through no efforts whatsoever of Coach Booth and before he had made any defensive media overtures.

Scandal involving public educators is inherently newsworthy, but as a general matter. The public had no independent interest in Coach Booth's performance beyond a general interest in the qualifications and performance of all state employees. Coach Booth, thrust into a controversy by the pre-meditated moves of Defendants, had no option but to defend himself and his reputation, a move that did not force him to abdicate his private figure status. *See St. Luke Evang. Lutheran Ch., Inc. v. Smith*, 74 Md. App. 353, 366–70 (1988), *rev'd in part on other grounds*, 318 Md. 337 (1990) (associate director of community ministry for church involved in controversy did not "thrust herself into the controversy" or otherwise give up status as private figure); *Richmond Newspapers, Inc. v. Lipscomb*, 362 S.E.2d 32, 37 (Va. 1987) ("the public had no independent interest in [teacher's] qualifications and performance 'beyond its general interest in the qualifications and performance of all government employees,' and, therefore, ... a private person" such that "the trial court erred in requiring [her] to prove" actual malice).

Even if the Court determined that Coach Booth was a public figure, a dispute of material fact exists as to whether Defendants acted with "with knowledge that it was false or with reckless disregard of whether it was false or not." *Batson v. Shiflett*, 325 Md. 684, 728 (1992). Whether a

statement was made with actual malice is a factually-intensive inquiry, inappropriate for consideration where there is little to no factual record on which to rely. *See Anderson*, 477 U.S. at 255-56 ("[T]he appropriate . . . question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence ... .") This is particularly so when the showing is based on "subjective awareness of probable falsity." *Gertz*, 418 U.S. at 335 n.6.

F.        **The Complaint States a Plausible Claim for Negligent Hiring and Supervision.**

Defendants ask the Court to dismiss the final count, alleging negligent hiring or supervision of Defendant Reeves by the Board and Defendant Santelises, arguing that there is "no nexus" between Reeves's prior misconduct and the harm that she allegedly inflicted on Coach Booth. They further argue that Coach Booth has "failed to establish that Dr. Santelises is individually responsible for the hiring and supervision of Dr. Reeves or any employees responsible for any hiring." Defs. Memo., 38.  Both of these arguments are without merit.

To prove a claim of negligent hiring or supervision, a plaintiff must prove (1) the employer knew or should have known "by the exercise of diligence and reasonable care" that the employee was capable of inflicting harm; (2) the employer "failed to use proper care in selecting, supervising or retaining that employee," and (3) the employer's breach of its duty was the proximate cause of the Plaintiff's injuries." *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 751 (D. Md. 1996). In order to show proximate causation, a plaintiff must allege facts to that would establish that "it was foreseeable that the negligent act would cause the specific injury complained of in the case." *Perry v. Asphalt & Concrete Services, Inc.*, 447 Md. 31, 54-55 (2016). The Complaint alleges facts sufficient to plead a plausible claim for negligent hire and supervision.

First, the Board and Santelises knew of Reeves's misconduct in her prior position as a school principal and hired her anyway, based on the allegations in the Complaint, which amounted to a lack of proper care. Upon her being hired, *The Baltimore Sun* warned about Reeves having been publicly fired from Washington, D.C. after a grade altering scandal at her school became public. **Cpl., ¶¶39-45**. A "publicly available audit" described Reeves as having "flagrantly violating applicable policies and regulations; failing to appropriately train educators and to make them aware of applicable policies; and directly and indirectly intimidating educators to perform their duties in an improper and inappropriate manner." *Id.*, **¶¶41-45, 154; Ex. 23**.

Second, the Complaint alleges facts sufficient to show that Reeves demonstrated misconduct and inadequacies caused Coach Booth's injuries. "What happened to Keith Booth was no mistake or accident." **Cpl. ¶39**. Defendants belated production of policies with their Memorandum is exactly consistent with Reeves's known failure to "appropriately train educators and to make them aware of applicable policies." *Id.*, **¶ 154**. "Defendant Reeves's acts and omissions with regards to Plaintiff Keith Booth are related to her incompetence, unfitness, and untrustworthiness. They also are related to her propensity to act inappropriately in order to cover these traits." *Id.* **¶¶157, 160**. Here, Plaintiff has suffered because Defendant Reeves engaged in that very same conduct as had been her pattern and practice at her prior school, making additional discovery on this matter appropriate.

To the extent that the Court is inclined to look beyond the allegations of the Complaint pre-discovery, Plaintiff hereby alerts the Court to information concerning Reeves's practice of improperly changing grades, for which she was fired, continued after her move to Dunbar and to which Plaintiff was widely known to be opposed. New documents show that on or around February 14, 2020 (four days after she fired Coach Booth), Reeves honored students whose

outstanding grades warranted placement on the "Principal's List" with a certificate. One of the students so honored was a student athlete on the boys' basketball team who, according to the Principal's certificate, had student earned a 3.9 grade point average. The father posted that certificate on social media. **Ex. 25.**[8] However, when the student athlete's grade point average had been provided to coaches less than two weeks prior, the listing showed that the student athlete had only scored a 2.4 grade point average. **Ex. 26**.

As the Complaint makes clear, Coach Booth was a stickler for grades. **Cpl., ¶¶50-51, 54, 57**. He would have never tolerated any grade changes or dishonesty with respect to his student athletes' grades. Four days before this certificate, Reeves caused Defendants to remove Coach Booth as head coach and order that "he no longer be permitted to report to any Baltimore City Public School for work, interact with the team or attend Dunbar's boys' basketball games" and "not to have any contact, whether in person or by phone, email, or any other means of communication, with any students (or their families) or staff of Baltimore City Public School." **Cpl., ¶85; Ex. 6**. Should the Court allow, Plaintiff will set forth these facts in an amended complaint, dispelling any question whether there is "nexus" between Reeves's prior misconduct and her removal of Coach Booth.

Perhaps the most curious and most feeble argument that Defendants make is their contention Coach Booth has "failed to establish that Dr. Santelises is individually responsible for the hiring and supervision of Dr. Reeves or any employees responsible for any hiring." **Defs. Memo., 38**. Maryland law patently states: "the county superintendent shall nominate for appointment by the county board … [a]ll principals, teachers, and other certificated personnel." Md. Code Ann., Educ. § 6-201(b)(1). The Policies of the Board make it clear that Santelises, the

---

[8] The names of students have been redacted from Exhibits 25 and 26 to protect minors.

Chief Executive Officer, has the authority of the county superintendent and the responsibility to appoint and promote principals such as Reeves. Ex. 24 ("Upon the recommendation of the Chief Executive Officer ("CEO") and subject to the provisions of State law, the Board ***shall appoint and promote*** all professional assistants of the CEO, ***principals***, and other certificated educational personnel."). State law and Board regulations squarely support the allegation in the Complaint that "Defendant Reeves was hired by, an employee of, and under the supervision of Defendants Board and Santelises." Cpl., ¶149. Discovery will certainly support this further.

<u>Conclusion</u>

For the foregoing reasons, Plaintiff Keith E. Booth, II, respectfully requests that the Court Deny Defendants' Motion to Dismiss or in the Alternative for Summary Judgment.

**<u>REQUEST FOR HEARING</u>**

Plaintiff respectfully request a hearing on Defendants' Motion to Dismiss Or, In the Alternative, Motion For Summary Judgment.

Dated:        July 12, 2020, Respectfully submitted,

_____/s/ Barry L. Gogel_____
Barry L. Gogel (Md. Fed. Bar No. 25495)
Marilee L. Miller (Md. Fed. Bar No. 17458)
RIFKIN, WEINER, LIVINGSTON LLC
2002 Clipper Park Road, Suite 108
Baltimore, MD 21211
(410) 769-8080 (Office)
(410)-769-8811 (Fax)
bgogel@rwllaw.com
mlmiller@rwllaw.com

## Certificate of Service

I HEREBY CERTIFY that on this 12th day of July 2020, the foregoing Memorandum in Opposition to Defendants' Motion to Dismiss, or in the alternative, Motion for Summary Judgment, and exhibits in support thereof, were filed electronically in the United States District Court for the District Court of Maryland.

_____/s/ Barry L. Gogel_____
Barry L. Gogel